In re Susan ROSNER, Debtor.

KREDIETBANK, N.V., Plaintiff,

v.

ESIC CAPITAL CORP. and Susan Rosner, Defendants.

Bankruptcy No. 182–13088–21.
Adv. No. 183–0448.

United States Bankruptcy Court,
E.D. New York.

April 15, 1985.

---

Zimmer, Fishbach & Hertan, New York City, for ESIC Capital Corp.

Slade & Pellman, New York City, for Kredietbank.

Finkel, Goldstein & Berzow, New York City, for debtor, Susan Rosner.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This proceeding involves the validity of two liens on the debtor's principal assets which were her residence and an adjacent piece of property in Old Westbury, New York, improved by a home, tennis court and a swimming pool.

At the time the debtor, Susan Rosner, filed under Chapter 11 and became a debtor-in-possession, ESIC Capital Inc. ("ESIC") held a second mortgage against both parcels of real property to secure a principal indebtedness of $250,000 which with interest and attorneys' fees now amounts to $329,117.17. Kredietbank, N.V. ("KB") held a one million dollar third mortgage against the single parcel of land improved by the debtor's former residence to secure a principal indebtedness in the approximate sum of $2,463,615.30, the product of a personal guarantee given by Rosner. The total now claimed by KB exceeds $3 million.

KB initiated this adversary proceeding to set aside and invalidate ESIC's second mortgage for usury and to vacate the automatic stay imposed by § 362 of the Bankruptcy Code precluding it from enforcing its rights under its third mortgage. The debtor answered and counterclaimed against KB for fraud and misrepresentation; she also cross-claimed against ESIC for usury.[1]

---

1. The debtor also instituted a third party action against John D. McCormick, the former president of KB Business Credit, Inc. ("KBBC") and her estranged husband, Stanley Rosner, for

ESIC joined Rosner in attacking KB's mortgage but defended its own, and by way of cross-claim requested an order directing the payment to it from the money held in escrow of the amount due it from Rosner.

Prior to the filing of this adversary proceeding, both parcels of real estate had been sold at public auction for the sum of $800,000 with the liens to attach to the proceeds. The net proceeds of this sale (after payment of the first mortgage to Bankers Trust Co. and of real estate taxes) are currently being held in escrow.

### JURISDICTION

At the time the complaint herein was filed on December 4, 1983, this Court had jurisdiction to hear and determine it by virtue of 28 U.S.C. § 1471(a) and the "Emergency Resolution" entitled *In re Jurisdiction of Bankruptcy Courts,* signed on December 21, 1982 by Chief Judge Jack B. Weinstein. That Resolution explicitly referred to the bankruptcy judges of this District "[a]ll cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11." See *In re Kaiser,* 722 F.2d 1574 (2d Cir.1983).

Subsequent to the enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law 98–353,

98th Cong.2d Sess. (1984), District Judge I. Leo Glasser, by Order dated July 30, 1984, determined this proceeding to be a core proceeding and referred it to me to determine in accordance with 28 U.S.C. § 157(b)(3) whether this proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and upon making this determination to hear and determine and to enter the appropriate orders and judgments pursuant to 28 U.S.C. § 157(b)(1). This Order supplemented a blanket order of reference signed by Chief Judge Jack B. Weinstein on July 12, 1984, amended August 7, 1984, referring all core proceedings arising under, or in, a case under Title 11 to the bankruptcy judge of the District to hear and determine.

Pursuant to these Orders of Reference, this Court holds this proceeding to determine the validity, extent or priority of liens and to lift the automatic stay to be a core proceeding arising in a case under Title 11 which this Court is authorized to hear and determine when such a proceeding is referred to it by the District Court. 28 U.S.C. § 157(a), (b)(1), (2)(G), (K). Also relevant to jurisdiction are the provisions included within the definition of a "core proceeding" "(A) matters concerning the administration of the estate"; "(E) orders to turn over property of the estate"; and "(O) other proceedings affecting the liquidation of the assets of the estate." [2]

---

fraud and misrepresentation with respect to the execution of the guarantee and mortgage. Stanley Rosner defaulted. With the concurrence of the parties, no action is being taken on the third party complaint by this Court at this time against John D. McCormick.

2. 28 U.S.C. § 157 provides in relevant part:
"§ 157. Procedures
 (a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.
 (b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to—
 (A) matters concerning the administration of the estate;
 * * * * * *
 (E) orders to turn over property of the estate;
 * * * * * *
 (G) motions to terminate, annul or modify the automatic stay.
 * * * * * *
 (K) determinations of the validity, extent, or priority of liens;
 * * * * * *
 (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims."

542

## THE FACTS

Susan Rosner, who initiated this proceeding by filing voluntarily under Chapter 11 of the Bankruptcy Code, operates no business and had no property at the time she filed, other than the home she had occupied for many years with her husband, Stanley Rosner, and the adjacent land and the home's contents. Apart from the monies she owes ESIC and KB on her guarantees of the debts of two corporations of which her husband was a stockholder, her debts are relatively small.

The two corporations, the debts of which she guaranteed and in connection with which she gave the mortgages on her home here involved, were Parachute Designs Ltd. ("Parachute"), and "Side-by-Side Sportswear, Inc." ("Side-by-Side").

ESIC received its mortgage interest in Susan Rosner's home as a result of a loan made to Parachute on April 20, 1977; KB's junior interest was the product of loans to Side-by-Side.

Parachute was organized by Stanley Rosner, the debtor's husband, sometime in early 1977. Its business was the purchase and sale at wholesale of ladies apparel. (Tr. 6/14/84 at 80). Originally, it imported its merchandise, later it manufactured it.

More or less contemporaneously with the organization of Parachute, Stanley Rosner applied to George Bookbinder, who was then President and principal stockholder of ESIC, for a loan of $225,000. *Id.* at 82–92. ESIC is a small business investment company ("SBIC") operating in accordance with regulations laid down by the Small Business Administration. 13 C.F.R. 107.

When Bookbinder met with Stanley Rosner and Spencer Kent, President of Parachute, he informed them that the SBA regulations did not allow ESIC to charge more than 15% interest on the loans it made, but that since "he could not be in business effectively at a 15% interest rate" that Parachute, if it wanted to borrow money, would have to enter into a consulting agreement with ESIC Advisory & Consulting Services, Ltd. ("ESIC Advisory"). (Tr. 6/14/84 at 122, 88–89; Tr. 8/6/84 at 11–12,

53). He "could not make a living strictly on loan money at 15 percent." (Tr. 6/14/84 at 157, 167–168). On a loan of $225,000 the fee of ESIC Advisory was to be $1600 a month. (Tr. 6/14/84 at 106–107). The size of the fee was a function of the size of the loan. (Tr. 6/14/84 at 108–109).

Bookbinder, who did not testify at the trial, but whose deposition, taken in Israel, was admitted into evidence, confirmed that from the outset, he made it clear, that no money would be forthcoming from ESIC unless Parachute accepted his counseling services. (Bookbinder's Deposition, 4/12/84, at 18–19, hereinafter "BK"). He told Rosner that he needed business advice; that the record showed him to be a good salesman, but not a good administrator; that he needed "a lot of help." (BK at 18–20). He represented himself to Rosner and Kent as knowledgeable in Parachute's business. (Tr. 6/14/84 at 125–126). He said that the services he would render would consist of making himself available, and that once a week he would visit Parachute's premises to see what was going on. (Tr. 6/14/84 at 123).

Neither Rosner nor Kent paid any attention to Bookbinder's description of the services he was to render since neither had any interest in his help, and regarded the service contract as simply part of the consideration they had to pay for the loan. (Tr. 6/14/84 at 129–130, 131–134; 8/6/84 at 38–54; BK at 19). At every negotiating meeting Rosner expressed his reluctance to enter into the consulting agreement. (Tr. 6/14/84 at 91–92).

When Stanley Rosner was asked why, if he did not want Mr. Bookbinder's services, Parachute had, nevertheless, entered into the consulting agreement, Rosner replied: "We needed the $225,000 and, as a business decision, if that is what it took to come along with it, that is what we did." (Tr. 6/14/84 at 90, 98).

Kent put the matter even more bluntly. Asked why he had signed the consulting agreement which sets forth that Parachute

had advised ESIC Advisory that it "will have a continuing need for financial advisory services and for this reason seeks 'to retain [ESIC Advisory]", and asked why he had signed this statement if it were not true, his reply was: "[I]f you are asking me if I took that paper seriously as far as consulting, no, I did not. I did it as part of getting a loan, if that's the question." (Tr. 8/6/84 at p. 26). When he was pressed as to whether he would sign a letter setting forth facts which were not the case, he responded: "Whether they were the case or were not the case was not important to me. The loan was important to me. It was stated that this was part of the loan agreement. I signed my name to it." (Tr. 8/6/84 at 26. See also 6/14/84 at 156–159). The language was dictated to Parachute by Bookbinder. (Tr. 6/14/84 at 157–159).

As Mr. Rosner summarized the negotiations: "The thrust of everything was Mr. Bookbinder explaining that, you know, in this day and age, 15 percent is not a lot of interest and you have got to make the money somewhere. $1600 a month was sort of his bonus. There was never any real intention to do any consulting. There was never any." (Tr. 6/14/84 at 90).

Indeed, the consulting agreement into which Parachute subsequently entered with ESIC Advisory, as a condition of receiving the loan from ESIC, did not obligate ESIC Advisory to provide any services whatsoever. (PX KB 11).[3] Whether or not any services would be rendered, as Bookbinder admitted, was left entirely within the discretion of ESIC Advisory. (BK 98–100).

ESIC imposed other conditions on its $225,000 loan in addition to its insistence on an annual retainer of $19,200 to ESIC Advisory. Parachute was required to sell ESIC 200 shares of its common stock at

$1.00 a share, which Parachute had the option to repurchase for $200,000 thirty days after it paid off its loan. (Tr. 6/14/84 at 95–96). However, the fees paid ESIC Advisory were allowed as an offset against this figure. Since over the six-year term of the consulting agreement, ESIC Advisory was scheduled to receive $115,200, repurchase of the stock would have required payment of an additional $84,000. (Tr. 6/14/84 at 102). This was an additional "kicker" for ESIC. (Tr. 6/14/84 at 100–101).

On April 20, 1977, the terms of the ESIC loan to Parachute were memorialized in the following documents:

A. An agreement among ESIC, Parachute, Stanley and Susan Rosner and others pursuant to which ESIC agreed to lend Parachute $225,000 to be paid in six years with payment guaranteed by various persons, including Susan Rosner. (PX KB 9). During the first three years, no part of the principal was to be paid, only interest, at the rate of $15,000 per annum; during the last two years, the principal was to be paid at the rate of $5,000 per month, with interest of 15% on the unpaid principal. A default under the consulting agreement, executed simultaneously, was made a default under the loan agreement and Parachute's note as well. (PX 9 at 15).

Paragraph "Sixteenth" of this agreement provided that if any of the provisions of any of the agreements being executed together was held to be unenforceable, illegal, void or contrary to public policy, this was not to affect the binding force of the other provisions. (PX KB at 16).

B. A promissory note for $225,000 running from Parachute to ESIC. (PX

---

**3.** The consulting agreement between ESIC Advisory and Parachute reads in part:

"... In the rendering of the foregoing services, we [ESIC Advisory] shall devote only that amount of time and attention as we deem necessary and shall only be required to perform consulting services after written request by you. Further, we shall determine, in our sole discretion, the form and manner of our services, and shall in no event be deemed required to render any written opinions or reports, nor shall we be required to render our services to you at any particular location or at any particular time." [Emphasis added]. (PX KB 11 at 2).

KB 10). The terms of the note were those set forth in the loan agreement.

C. A mortgage from Susan Rosner to ESIC to secure the payment of the $225,000 loan. (DX ESIC Z). The mortgage covered both her Westbury home and the adjacent property.

D. A security interest executed by Susan Rosner to ESIC, as security for the Parachute note, in all furniture, fixtures, and all other personal property located in the Westbury residence. (DX ESIC AA).

E. A letter agreement whereby Parachute "[t]o induce [ESIC] to consummate the foregoing loan" sold ESIC 200 shares of its stock for $200,000 with the option to repurchase for $200,000 upon payment of the loan. (PX KB 31).

F. A consulting agreement between ESIC Advisory and Parachute. This agreement committed Parachute to pay ESIC Advisory $1600 a month for the life of the loan. (PX KB 11). This payment was to remain constant. The consulting agreement was terminable only after complete repayment of the $225,000 loan (PXs KB 11).

G. A letter signed by Spencer Kent, committing Parachute to provide ESIC with a monthly schedule of its aged accounts receivable. (DX ESIC (BK) 1).

H. A letter dated April 19, 1977, from Parachute's attorneys, Fogel, Kamhi & Spiegler, P.C. (DX ESIC (BK) 6), in which that firm said that it had examined the loan agreement, promissory note and guarantee, the financial consulting agreement with ESIC Advisory, together with other documents, and it was the firm's opinion that it had "no knowledge of any agreement, instrument, or document, or contractual restriction, the terms of which would prohibit the transaction contemplated ..." (DX ESIC (BK) 6). It was ESIC's practice to obtain such a letter from its borrowers and the letter was furnished ESIC at the request of ESIC's attorneys. (BK at 29; Tr. 6/14/84 at 151–156). According to Bookbinder, he relied on this letter in entering

into the agreements he did with Parachute. (BK at 30).

Under the loan agreement, ESIC had the first right to provide any further financing needed by Parachute. (PX KB 9 at 10–11). Subsequent to April 20, 1977, additional loans were made to Parachute: $20,000 on February 9, 1978, repaid on March 3, 1978 and April 3, 1978; $75,000 on April 27, 1978; $25,000 on May 9, 1978; and $25,000 on June 12, 1978; $10,000 repaid on August 30, 1978, $5,000 repaid on October 2, 1978, and $100,000 on December 19, 1978. (Tr. 8/6/84 at 69; PX KB 24).

When, as a result of the new loans made in March and April, 1978, the outstanding balance rose to $325,000, the financial consulting agreement with ESIC was amended to increase the monthly fee to $2,000. (Tr. 6/14/84 at 108; DX Rosner 1). The reason for the increase, Stanley Rosner testified and the Court finds, was that Parachute borrowed more money from ESIC. (Tr. 6/14/84 at 108, 166). The increase in the fee did not result in any increase in the services rendered by ESIC to Parachute since no services of value to Parachute were being rendered. (Tr. 6/14/84 at 109).

On December 19, 1978, when the $100,000 was repaid, bringing the balance back to $225,000, the advisory fee went down again to its previous level of $1600 per month. (DX ESIC (BK) 19; Tr. 6/14/84 at 110).

There was other activity in relation to ESIC's loan to Parachute. Certain collateral was replaced. (DX ESIC (BK) 8, 9; Tr. 6/14/84 at 138–139, 144). A new guarantee was secured because of some changes in the persons interested in Parachute. (DX ESIC (BK) 10); Tr. 6/14/84 at 144). Parachute bought 400,000 shares of ESIC's preferred stock for $40,000 which was pledged back to ESIC as collateral. (DXs ESIC A, B (BK) 12); Tr. 6/14/84 at 90–91, 139–145). ESIC still has that stock. (Tr. 8/6/84 at 107).

George Bookbinder, who did not appear at the trial, claimed that he rendered numerous services to Parachute during the entire life of the loan. (BK). Because Book-

binder's testimony was taken by deposition, this Court had no opportunity to observe his demeanor or to judge his credibility by anything other than what the cold record reflects. What the record shows, however, is an evasive witness with a selective memory.[4]

According to Bookbinder, he regularly reviewed schedules of accounts payable and financial statements, discussing them with Milton Schneider, Parachute's Comptroller. (BK 37–41; DXs ESIC (BK) 15, 16, 17, 18). He also reviewed the reports made by two accountants employed by ESIC who visited Parachute regularly to review their accounts receivable, payable, etc. (BK 49–50). After these accountants had discussed their observations with Mr. Schneider, he would take them up with Schneider and Stanley Rosner (BK 49). In addition, he claimed to have had over fifty meetings with Rosner, Kent and Schneider with respect to the affairs of Parachute, confirmed by his diary entries. (BK 63; DX ESIC E).

Stanley Rosner and Spencer Kent both flatly denied that ESIC Advisory rendered any services to Parachute at any time. (Tr. 6/14/84 at 163, 167–178; Tr. 8/6/84 at 55–56). When Rosner was asked whether there was any change in the level of consultation that ESIC Advisory furnished Parachute, when the fee dropped from $2,000 back to $1600, he answered, "ESIC Advisory, George Bookbinder, David Halpern never advised Parachute Designs on anything, on anything." (Tr. 6/14/84 at 111).

Rosner testified that whatever financial expertise Parachute required, he supplied. He testified that Bookbinder gave no finan-cial assistance in running the company, provided no consulting advice and rendered no consulting services. (Tr. 6/14/84 at 97–98). Whatever face-to-face meetings the two men had related solely to new financing and new loans. (Tr. 6/14/84 at 146–147, 163–164).

The monitoring of Parachute's financial situation described by Bookbinder as services to Parachute were activities of the character ESIC engaged in with all its borrowers to protect its loans. (BK at 111–112).

Up to December 1978 Parachute made the payments called for by the loan agreement and the consulting agreement. After December 19, 1978, Parachute made no further payments of principal. (PX KB 24; Tr. 8/16/84 at 69). Interest and the $1600 paid ESIC Advisory (carried on ESIC's records as "Management Fees") continued to be paid until March 31, 1980. (PX KB 24; Tr. 8/6/84 at 69–70). Nothing has been paid since that date. (Tr. 7/6/84 at 70).

Other borrowers from ESIC entered into consulting agreements with ESIC Advisory exactly as did Parachute. In all, ESIC entered into forty-five such agreements, thirty of them prior to its agreement with Parachute. (Tr. 8/6/84 at 112).

On December 4, 1980, the SBA wrote ESIC that its transactions with several borrowers violated SBA's regulations. (DX ESIC CC). ESIC was charged with violating 13 C.F.R. 107.1001(b) by requiring borrowers to purchase ESIC's preferred stock to pledge as collateral for ESIC's loans. Named as one of the concerns forced to do so was Parachute. The letter also said

---

**4.** Illustrative of the quality of his testimony is the following exchange when, on cross-examination, he was asked with how many companies ESIC had had consulting agreements similar to that with Parachute. (BK 73). During his direct testimony, he had testified that ESIC had made loans to approximately forty companies. (BK 13–14).

He was then asked:

Q. And with how many of those companies did you have consulting agreements similar to the kind that we have already marked as Defendant's Exhibit 4 for identification?

A. It is very hard for me to say, I have no records in front of me.

Q. Well, did you have consulting agreements with any of these forty companies?

A. With some.

Q. Was it more than twenty?

A. I don't know.

Q. Was it less than twenty?

A. I don't know.

Q. Was it more than ten?

A. It is very hard for me to say without records. BK at 73.

that there were allegations that the management services agreements entered into with ESIC Advisory simultaneously with the execution of ESIC loans were not requested by the firms involved and were imposed as a condition to the financing. The letter continued:

"It is alleged by the investigation, for example, that fees paid to the Licensee by ... Parachute Designs, Kenneth Warren ... were for unwanted services, and instead constituted a charge imposed by the Licnesee to insure a return greater than 15 percent allowed under 13 C.F.R. Section 107.301(d) of our Regulations." *Ibid.* (DX ESIC CC at 3).

The letter stated that the SBA was requiring the licensee to re-purchase the preferred ESIC stock and to repay to the cited concerns, or credit their outstanding principal balance, with all fees or charges imposed as a condition of the financing. (DX ESIC CC). The letter concluded that if the above matters were not resolved within thirty days, appropriate action would be taken.

Prior to the receipt of this letter, Bookbinder left for Israel where he has remained ever since. (Tr. 8/6/81 at 116; BK at 70–71). In May 1981, he ceased to be a director and an officer of ESIC. (Tr. 8/6/81 at 101; BK at 88–89). He still owns close to 50% of its stock. (BK at 2; Tr. 8/6/84 at 93).

On May 7, 1981, ESIC wrote Rosner that it was crediting the advisory fees paid by Parachute and Kenneth Warren Ltd. to the interest and principal owed by Parachute. (DX ESIC X). (Kenneth Warren was a sister company to Parachute) (Tr. 6/14/84 at 136). These credits reduced the outstanding loan balance to $192,395.85. (DX ESIC BB). The credit given Parachute was part of nearly a quarter of a million dollars similarly credited back to other borrowers because of consulting agreements with ESIC Advisory. (Tr. 8/6/84 at 99–100).

Later the same year ESIC's attorney wrote Susan Rosner that ESIC's loan was in default and that unless payment was made in full within a week, suit would be instituted to foreclose on all security delivered in connection with the loan by ESIC to Parachute. (DX ESIC KK). Such suit was brought in the Supreme Court in Nassau County by ESIC against Parachute and various guarantors of the loan, including the debtor.

The filing of the petition in Chapter 11 by Susan Rosner has automatically stayed this suit as against her. As of June 30, 1984 the total owed ESIC by Parachute, including interest and attorney's fees, was $329,117.17 (DX ESIC BB).

## DISCUSSION

The legality of the various transactions here involved is to be resolved by reference to New York law.

New York withholds from corporations the benefits of the statutory limits on interest imposed by New York's general usury statute. N.Y. General Obligations Law, § 5–521(1), (McKinney's 1978).

But loans to corporations are covered by the criminal usury provisions of § 190.40 of the New York Penal Law. N.Y. General Obligations Law, § 5–521(3), (McKinney's 1978). Section 190.40 provides:

"A person is guilty of criminal usury ... when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period of time."

Section 5–521(3) specifically provides that the prohibition against the interposition of the defense of usury by a corporation does not apply to the defense of criminal usury.

A recent statute takes outside the reach of the ceiling prescribed by the Penal Law loans aggregating $2.5 million or more. General Obligations Law, § 5–501(6)(b). (McKinney's 1984–1985).

The principles applicable where usury is claimed have recently been restated by New York's highest court:

"... [U]sury must be proved by clear evidence as to all its elements and will not be presumed (see, e.g. *Giventer v. Arnow*, 37 N.Y.2d 305, 309 [372 N.Y.S.2d 63, 333 N.E.2d 366]), ... [the] forfeiture imposed by usury statutes is penal in nature (McKinney's Cons Laws of NY, Book 1, Statutes, § 273). In this regard, it has been noted that in cases of civil usury '[t]he [New York] courts, however, anxious to avoid the harsh penalty of forfeiture, have placed the burden of proving the transaction usurious on the borrower, declaring that the defense of usury must be 'decisively proved * * * and not * * * left to inference or implication.' " *Freitas v. Geddes Savings and Loan Ass'n.*, 63 N.Y.2d 254, 261, 481 N.Y.S.2d 665, 471 N.E.2d 437 (1984) and authorities there cited.

■ The critical element is usurious intent, which is a question of fact where the debt is not usurious on its face.

"Usurious intent, an essential element of usury, which is embodied in the statutory requirement that an unlawful rate of interest be knowingly taken (Banking Law, § 380–e), is a question of fact. (*Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 594 [446 N.Y.S.2d 917, 431 N.E.2d 278]). It is the prevailing view that where usury does not appear on the face of the note, usury is a question of fact. (*Mutual Protective Corp. v. Palatnick*, 118 Conn. 1, 4 [169 A. 917]; *Chicago Tit. & Trust Co. v. Jensen*, 271 Ill App 419, 422; *Janisse v. Winston Inv. Co.*, 154 Cal App 2d 580 [317 P.2d 48]; see also *Matter of Gurinsky*, 105 F Supp 42; Note, California's Model Approach to Usury, 18 Stan L Rev 1381, 1390). It has been properly observed: '[I]f the note or bond shows a rate of interest higher than the statutory lawful rate, it would be immaterial whether the lender actually intended to violate the law. His intent would be conclusively presumed ...' " *Id* at 262, 481 N.Y.S.2d 665, 471 N.E.2d 437.

■ Both parties to the usurious agreement must have the requisite intent. "The intention to take the usury must have been in the full contemplation of the parties, not of one party but of both to the transaction." *Condit v. Baldwin*, 78 A.D. 137, 21 N.Y. 219, 222 (1860). The specific intent must be shown by "clear, unequivocal and convincing proof." *Bascombe v. Marshall*, 129 App.Div. 516, 518, 113 N.Y.S. 991 (2d Dept. 1908), *aff'd*, 198 N.Y. 538, 92 N.E. 1077 (1910).

## The ESIC Loan

The facts respecting the ESIC loan to Parachute, for which the Rosner mortgage was given as security, meet the high standards of proof laid down by the New York Courts. Through the transparent device of a consulting agreement, requiring no services to be performed, and demanded on the explicit ground that greater compensation was required for the use of ESIC's money than it was permitted to charge, a rate of interest well in excess of 25% over the life of the loan was contracted for. That the additional compensation was dubbed an advisory, or management, fee is without significance; substance, not form, is decisive. "It was early recognized by the courts that if the form of the contract were to be controlling, the statute against usury would be substantially unenforcible, and thus it was made the duty of the court in each case presented to examine into the substance of the transaction between the parties and determine whether the intent which prevaded it was one which violated the statute." *Hall v. Eagle Insurance Co.*, 151 App.Div. 815, 826, 136 N.Y.S. 774 (1st Dept.1912), *aff'd*, 211 N.Y. 507, 105 N.E. 1085 (1914).

As the Second Circuit has had occasion recently to point out in a case turning on whether a bankrupt was an agent, as described in his contracts, or an independent actor,

"[W]here the public interests or the rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it. *Quackenbos v.*

*Sayer*, 62 N.Y. 344, 346 (1875). A usurious loan is not made lawful by falsely terming it a sale, *Id.*, or a corporate obligation. *Topping v. Bank of New York*, 86 F.2d 116, 117–18 (2d Cir.1936). ... 'Where the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form.' " *In re Schulman Transport Enterprises, Inc. (Pan American World Airways, Inc. v. Schulman Transport Enterprises, Inc.)*, 744 F.2d 293, 295 (2d Cir.1984).

It is no accident that two of the precedents cited by the Second Circuit involve usurious transactions. *Quackenbos v. Sayer* and *Topping v. Bank of New York.* This is because persons intending to enter into usurious transactions take pains to camouflage as payment for services or property, or anything other than what it really is, the interest they are exacting.

More than a hundred years ago the highest court of the State of New York pointed out in the case cited by the Second Circuit that: "The shifts and devices of usurers to evade the statutes against usury have taken every shape and form that the wit of man could devise, but none have been allowed to prevail. Courts have been astute in getting at the true intent of the parties, and giving effect to the statute." *Quackenbos v. Sayer*, 62 N.Y. 344, 346 (1875). The guiding principle therefore is that "the transaction must be judged by its real character, rather than by the form and color which the parties have seen fit to give it." *Ibid.* at 346. *See also De Korwin v. First National Bank of Chicago*, 170 F.Supp. 112, 128 (N.D.Ill.1958), *aff'd*, 275 F.2d 755 (7th Cir.), *cert. denied*, 364 U.S. 824, 81 S.Ct. 61, 5 L.Ed.2d 53 (1960) (interpreting New York law).

One well-recognized way of concealing an usurious transactions is "an obstensibly unrelated contract providing for payment by the borrower for the lender's services which are of little value or which are not in fact to be rendered." Annotation: Usury-Independent Contract Payments, 81 A.L.R.2d 1280, 1282 (1962).

Just such a contract was involved in *Grannis v. Stevens*, 216 N.Y. 583, 111 N.E. 263 (1916). In that case the Court of Appeals affirmed the direction of a verdict in favor of the defendants after trial holding that the trial court had correctly concluded the loan in question to be usurious. In that case the plaintiff and the brother of the defendants (the brother being a broker and the real party in interest) agreed that the plaintiff would lend the proceeds from the sale of his stock exchange business to the brother in return for which he was to receive not less than $10,000 a year. After the loan was made and a note given bearing 6% interest, the brother and the plaintiff entered into an agreement in writing which provided that the plaintiff was to be employed by the brother and be paid $533.00 each month. To quote the Court of Appeals,

> "Such sum was 'to make up the balance' of $10,000 per annum, unpaid by the interest at six percentum per annum upon the amount of the note. The brother agreed with the plaintiff that his compensation should vary, dependent upon the amount of business he brought in. The plaintiff did not render any substantial service as an employee to the brother or his firm. The brother testified, without contradiction, that he agreed to pay the plaintiff $10,000 a year for the use of his money in the firm, for the $60,000 he had in as capital; that plaintiff was supposed to draw at the rate of $833.33 each month, or $10,000 a year, and that the agreement to pay him $533 a month grew out of his having loaned the money." *Grannis v. Stevens, supra* at 590, 111 N.E. 263.

On the basis of these facts, the Court of Appeals said:

> "A transaction of the character of the agreement of employment between the brother and the plaintiff may be a mere device or subterfuge to conceal usury and be assailed as and found to be such. If the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and im-

perative duty is to declare and hold the security void. This conclusion does not conflict with the established principle that the presumption is against the taking of usury, which must be established by clear evidence as to all the elements essential thereto." 216 N.Y. at 591, 111 N.E. 263 [citations omitted].

The facts in this case are stronger than in *Grannis* since there the compensation was made variable depending upon the amount of business that the plaintiff brought in, suggesting that something more than interest on the loan was involved, whereas here the amount to be paid was fixed and wholly independent of whatever services ESIC elected to render, and was tied directly to the amount of money at risk, since when the loan went up so did the so-called compensation on the employment contract, and when the loan went down the compensation diminished.

Indeed, it would be hard to conceive of a more naked or more brazen disregard of the prohibitions, not only of the laws of New York, but of the Federal regulations under which ESIC operated, than the transaction into which it entered with Parachute. Bookbinder did not disguise the fact that the fees called for in the advisory contract were needed as compensation for the use of the monies he was making available. He told Rosner flatly that he could not live on fifteen percent a year. In short, he needed compensation over and above the figure labeled as interest. The advisory fee was additional interest because it was the compensation fixed by the parties for the use of money.

Both parties to the transaction recognized that the fee paid ESIC Advisory was part of the cost of borrowing money from ESIC. Both parties so intended it and both parties, therefore, had the necessary usurious intent.

Bookbinder told Stanley Rosner and Spencer Kent that he could not operate with only a 15% return on his money; Rosner and Kent both understood that the advisory fee had to be paid to get the loan. That Spencer Kent denied that he viewed the fee as "interest" is of no consequence; is not the label that Kent put on the payment that determines its character, but what he intended the fee to buy. If, as the evidence makes clear, what the advisory fee bought was the loan of $225,000 from ESIC, the fee was interest and if the fee when added to the sum dubbed interest exceeded 25%, the usury statute was violated. That the interest ceiling ESIC was trying to avoid was the 15% imposed by the SBA rather than the 25% imposed by the Penal Law is legally irrelevant. In either case, the purpose of the advisory agreement was to extract more interest and if that interest exceeded that allowed by the Penal Law, usury was present.

That the so-called advisory contract was nothing more than additional interest is shown by the following facts: First, entry into the advisory contract was an explicit condition to receipt of the loan; second, the advisory fee paid was directly related to the size of the loan and rose and fell with the amount of the loan; third, a default in the payment for services under the advisory contract was a default under the loan agreement. While on the one hand the fees under the advisory agreement had all the characteristics of interest the advisory agreement itself lacked most, if not all, the indicia of an employment agreement. Parachute had no election to accept, or reject, the employment agreement or terminate it; ESIC was not under any obligation to furnish any services whatsoever; and the principals of Parachute were so indifferent to the services they were obstensibly buying that they could not even recall how they were described by Bookbinder.

Bookbinder and ESIC's various efforts to preserve ESIC's usurious transaction with Parachute from condemnation are meritless. ESIC urges that the debtor is estopped from asserting the defense of usury because at the time the transaction took place ESIC received from the attorneys for Parachute a letter stating that there was no legal impediment to the contract into which they entered. The claim that ESIC, which entered into at least thirty similar

transactions with other concerns prior to that with Parachute, was misled by or relied upon a letter from Parachute's attorney, which was one of the conditions laid down by ESIC for the loan, is not believable. Even more to the point, however, the prohibitions against usury are not so easily evaded. Otherwise, every lender would simply have to demand from a borrower already desperate enough to pay interest in the loan-shark range, a letter declaring the transaction legal.

To quote Chief Justice Cooke writing for two other members of the Court in taking issue with the majority as to the effect to be given an estoppel certificate where usury was claimed:

> "If the lender can compel the individual to incorporate, there is no reason why that same individual cannot be compelled to sign a waiver of defenses. And this 'compulsion' need not amount to legal duress—the same circumstances which drove the borrower to the usurious lender in the first place will also serve to motivate the execution of the waiver."

*Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 596, 446 N.Y.S.2d 917, 431 N.E.2d 278 (1981).

Equally flimsy is the elaborate recitation of the services which ESIC Advisory and Bookbinder allegedly rendered pursuant to the advisory agreement, although under no obligation under the terms of the contract to furnish any. First, the details which Bookbinder, safe in Israel, has so meticulously put together of the financial statements reviewed, the telephone calls made, the accountant's visits, etc., are all of a character normal to the careful policing of a loan rather than services rendered the borrower.

Even if Bookbinder's portrayal of the careful surveillance maintained over the business of Parachute were to be deemed services rendered that company it would make no difference. The nature of the agreement was fixed when it was made, not by what occurred thereafter. Could it seriously be contended that the agreement would have been usurious, if no services

were rendered, but that it was taken out of the usury statute because some services were performed? In the face of the clear and convincing evidence that Parachute was given no alternative if it wanted to borrow money from ESIC but to pay a fee to ESIC Advisory precisely proportionate to the money borrowed, whatever Bookbinder did, or did not do, thereafter cannot change the character of the agreement, nor divest it of its usurious nature.

In the context of all the facts, the care that Bookbinder took to salt the negotiations with reference to his services, and their value, must be deemed part of a smokescreen deliberately thrown around the whole transaction by a sophisticated lender who was well aware of the risk he was running in seeking a return higher than the 15% interest allowed him by SBA's regulation.

■ Where an obstensibly independent and unrelated contract, as here, is used to disguise usury it is not necessary that that contract itself be illegal, improper or illusory, nor totally lacking in substance. Thus, for example, in *Grannis v. Stevens, supra,* although the lender "did not render any substantial service" in return for the fee he was paid, the implication is that some services were rendered. Nevertheless, the contract was void for usury. Similarly, in *Quackenbos v. Sayer, supra,* where the independent contract, as is not unusual, took the form of a sale of bonds, the bonds were undoubtedly of value and their sale even for excess consideration might have been entirely proper, but for the fact that the sale, like the employment contract here, was simply a device to extract an exorbitant rate of interest.

To quote the New York Court of Appeals, the test which that Court laid down a century ago, is: "The sole question is, whether the transaction was a *bona fide* sale of the bonds at an exorbitant rate, or a loan of money under the guise and color of sale of choses in action, by which the lender reserved or secured to himself a greater rate of interest than that allowed by

law." Quackenbos v. Sayer, 62 N.Y. 344 at 346.

Applying that test to the facts of this case, Parachute's contract with ESIC Advisory was not a *bona fide* service contract, but a device by which ESIC secured a greater rate of interest than the 25% allowed by law. At some point in time, the sum of the 15% interest under the loan agreement and the fixed monthly fee, $1600, called for in the advisory agreement would exceed 25% of a diminishing principal. Therefore, the transaction from its inception was usurious making both principal and interest forfeit. Accordingly, ESIC is entitled to no part of the proceeds from the sale of the real property covered by its mortgage nor to enforcement of its security interest in the debtor's other property.

### The Mortgage to KB

In addition to Parachute, Stanley Rosner and Spencer Kent used another corporate vehicle, Side-by-Side, through which to carry on the business of manufacturing and selling ladies apparel. A third man, Ronald Axelrod, also had an interest in this corporation.

On November 27, 1979, Side-by-Side entered into a conventional, accounts receivable financing agreement with KB Business Credit. (PX KB 2A).

At the time KB Business Credit was a division of KB which is a banking corporation organized under the laws of Belgium and authorized to do business in New York. One month later, KB Business Credit ceased being a division of KB and became an independent, subsidiary corporation operating under the name of KB Business Credit, Inc. ("KBBC"). The new entity which succeeded to the business of KB Business Credit was organized and incorporated under § 402 of the New York Business Corporation Law. (*See* DX ESIC JJ). KBBC was not a bank, but a commercial finance company. (Tr. 6/14/85 at p. 298). KBBC was dissolved by shareholder proclamation in mid-1983. Although KB, which succeeded to the assets of KBBC, is the plaintiff in this proceeding, KBBC,

throughout the entire course of the transaction with Side-by-Side, except for the first month, was the lender. (For convenience, "KB" is used herein to designate both "KB" and "KBBC".)

When the financing agreement was entered into, Susan Rosner was asked to sign, together with her husband, a personal guarantee. (PX KB 3). She went to the office of Joseph McCormick, President of KB, for this purpose. (Tr. 8/8/84 at 8–11).

All the conversation she had with Mr. McCormick on this occasion was an exchange of civilities. (Tr. 8/8/84 at 48–51).

Mrs. Rosner testified, but the Court does not credit her evidence, that she specifically asked McCormick whether the wives of Rosner's two partners were going to be signing similar papers as well, (Tr. 8/8/84 at 13–17, 45–47), to which he responded that they were coming in the same day and were going to sign the same papers, and he showed her similar papers "drawn up with their names typed in, and waiting for their signatures to be put in." (Tr. 8/8/84 at 13–14).

In point of fact, Ronald Axelrod signed a similar guarantee but his wife did not annex her signature to it. (DX ESIC O).

Mrs. Rosner claims that not before November, 1981 did she learn that Mrs. Axelrod had not signed a guarantee like the one she gave. (Tr. 8/8/84 at pp. 133–134).

The guarantee signed by Mrs. Rosner "unconditionally guarantees payment to [KB] of all indebtedness which may now or hereafter be owing to [KB]" by Side-by-Side. (PX KB 3). It goes on to provide,

"[T]his guarantee shall not be impaired by any modification, supplement, extension or amendment of the financing agreement or of any contract or agreement to which the parties thereto may hereafter agree, nor by any modification, release or other alteration of any of the indebtedness and obligations hereby guaranteed or of any security therefor, nor by any agreements or arrangements whatever with the Client [Side by Side] or any one else; that the liability of each

guarantor is direct and joint or several ... that your [Kredietbank's] books and records showing the account between you [Kredietbank] and the Client [Side by Side] shall be admissible in any action or proceeding ... for the purposes of establishing the items set forth therein and shall constitute prima facie proof thereof; ..."

Under the terms of the loan agreement, KB advanced monies to Side-by-Side on a revolving credit basis secured by the corporation's accounts receivable and inventory. The ceiling on this loan was initially capped at $1,000,000. Advances were made according to a formula whereby Side-by-Side received operating funds up to 80% of its eligible accounts receivable and 50% of its inventory. (Tr. 6/15/84 at p. 226). When payments were received from Side-by-Side's customers the outstanding loan balance was reduced by these remittances. (Tr. 6/15/84 at p. 215).

By agreement Side-by-Side was charged interest at a rate of the prime commercial rate plus 6%. (Tr. 6/15/84 at p. 182, *See* PX KB 2). The prime lending rate was fixed and established by KB each month and was verbally communicated to Side-by-Side. (Tr. 6/15/84 at 191–192, 202). The prime rate as of the last day of the preceding month was controlling for the entire next month. (*Id.* at 192–193.) KB computed interest daily and charged interest monthly (PX KB 2A; Tr. 6/15/84 at p. 176). KB computed interest by totalling Side-by-Side's daily balances for the month involved and then adding a five-day float charge. This was done by multiplying by five all the cash received that month. The sum of the daily balances and the five-day float was then multiplied by the interest rate for that month, then multiplied by the number of actual days in the month and divided by 360. The result of this calculation was the amount of interest payable that month. (Tr. 6/15/84 at 197–201, 175–176; PX KB 1A, 1B).

This interest charge was carried over as part of the unpaid principal balance the succeeding month. (Tr. 6/15/84 at 176).

In the subsequent month, a new interest rate was then applied using the same formula against the entire sum without any distinction between principal and accrued interest. As payments were received from Side-by-Side, the entire loan balance was reduced without any distinction between principal and interest. (Tr. 6/15/84 at 176–179).

The use of a 360-day, rather than a 365-day, year, in calculating interest increases the amount of interest that is paid and is the reason for its employment by KB. (Tr. 6/15/84 at 197). It raised the annual rate of interest in any month in which the 25% rate was used in the calculations to 25.35%. (Tr. 8/6/84 at 130, 141, 155–156; DX ESIC EE). In consequence, during the following months in 1981, KB charged Side-by-Side more than 25% interest on its balance that month: January, February, March, June, July, August, September, October. (DXs ESIC DD, EE, FF; Tr. 8/6/84 at 128–140).

The five-day float period used by KB is an arbitrary figure selected by KB to compensate itself for the clearance period on remittances from Side-by-Side (Tr. 6/15/84 at 197). The five-day float applied to all incoming receipts although checks sometimes cleared in as little as two or three days depending upon their place of origin (Tr. 6/14/84 at 73), and KB's bank made these monies available to KB in as little as three to five days. (Tr. 6/14/84 at 76). Nevertheless, whatever the actual period of time a check took to clear and regardless of when its proceeds became available to KB, the assumption was made in computing interest that five days elapsed between receipt and availability. Through the use of five float days, KB charged interest on a higher amount than the actual balance of monies outstanding for the month. (Tr. 6/15/84 at 200).

Side-by-Side was not required to pay interest on a monthly basis. (Tr. 6/15/84 at 209). Indeed, KB had no expectation that interest payments would be received. (Tr. 6/15/84 at 214). At the end of each month, Side-by-Side received a statement from KB showing the prior balance, the interest

charged, the new loan balance, and requesting it to adjust its records accordingly. (Tr. 6/15/84 at 216; DSx ESIC F, G).

A commercial finance borrower, such as Side-by-Side, never has to "clean up" its loan periodically by making full payment of the principal and interest due and thereby lose the availability of funds. (Tr. 6/15/84 at 178). Commercial finance lenders allow customers to borrow and owe money on every day of the year because the lender relies on the continued creation and payment of accounts receivable in which it has a security interest to pay off the debt. (Tr. 6/15/84 at 178–179).

Stanley Rosner and Ronald Axelrod both took junior participation positions in KB's loan to Side-by-Side. (PXs KB 33A, 33 BK; Tr. 6/15/84 at 183–189). Mrs. Rosner was not aware that they had done so. (Tr. 6/15/84 at 183–184).

Almost from the inception of the loan, Side-by-Side's cash advances from KB exceeded the value of the accounts receivable and inventory which were securing the loan. (Tr. 6/15/84 at 294). On only three days during 1979, 1980 and 1981 was Side-by-Side not in an overdraft position. (Tr. 6/15/84 at 296; PX 1B).

As early as June, 1980 a subordinate KB official was concerned about the loan because of the extent of the over-advances. (Tr. 6/15/84 at 229–230). McCormick was confident, however, that the situation would reverse itself.

In May 1981, however, when Side-by-Side ceased generating sales, KB began reviewing the situation to examine its exposure. (DX ESIC 1; Tr. 6/15/84 at 237). An internal KB memorandum of that date notes that the shortfall will be greater than anticipated but that the "principal has access to certain assets outside of the company that may be used to reduce our outstanding [sic]." (DX ESIC I).

A portfolio analysis prepared in June 1981 for internal KB use noted as to Side-by-Side:

"The Side-by-Side accounts has reached the end of its season ... The shortfall will be worked out and a payment program established with the principals who will continue in business under a corporate name and financed by other sources ... The principal has other assets, primarily equity in her home. We have his and his wife's personal guarantee and expect to work out a mutually satisfactory payment program with her." (DX ESIC V; Tr. 6/15/84 at 279–282).

In June 1981 KB instructed Side-by-Side's account debtors to make payment directly to KB instead of Side-by-Side so as to eliminate any loss of collateral. (Tr. 6/15/84 at 268–269, DX ESIC S).

Visits by KB personnel to the premises of Side-by-Side the following month disclosed that they displayed a sign saying that all real property were assets of KBBC and that the premises were a shambles with almost no inventory on hand. (DXs ESIC J, K; Tr. 6/15/84 at 238–241).

For all practical purposes cash advances to Side-by-Side by KB ceased in August 1981. That month $3,964.82 was advanced. In each of the months of September and October, 1981 less than $3,000 was advanced. (PX 1A).

By letter dated August 26, 1981 the attorneys for KB wrote Susan Rosner advising her that Side-by-Side was in default on its obligations to KB and asking her to make arrangements to honor her guarantee. (DX ESIC M). The letter concluded that unless she responded on or before September 1, a suit would be entered against her to protect KB's interest. As of that date Side-by-Side owed KB $2,463,615.30.

Sometime in August during the course of a conference in the office of KB's attorney attended by Spencer Kent and Stanley Rosner, it was agreed that KB would be given mortgages on the homes of both men. (Tr. 8/8/84 at 117–124).

This was not the first time such a mortgage had been discussed. Stanley Rosner testified that McCormick had been asking for such a mortgage from April 1981 on,

promising that it would not be "acted upon", that it was "just there as a security basis." (Tr. 8/8/84 at 111–113).

The same month there had earlier been a meeting in the office of the attorney for Side-by-Side attended by McCormick which had concluded with the decision that no mortgage be given. (Tr. 8/8/84 at 114–116).

On Labor Day, September 7, 1981, Stanley Rosner told his wife, with whom he was having marital problems so that he was not living at home continuously, that McCormick, the President of KB, was coming to her house to have her sign various papers. He arranged for her uncle to be there as a witness. McCormick arrived with a one-page letter agreement and a multipage mortgage. (PXs KB 6, 7).

McCormick said nothing to Mrs. Rosner about either the condition of Side-by-Side nor about the mortgage Mrs. Rosner was being asked to sign. (Tr. 8/8/84 at 62). He did not tell her that Side-by-Side was in default. *Ibid.* No one else made any representations to her about the two documents. *Ibid.*

The letter agreement which Mrs. Rosner signed on September 7, 1981 is a brief document. (PX KB 6). The text consists of an offer by KB to which Susan Rosner, by appending her signature, indicates her agreement, acceptance and consent. The text reads in part:

> "The undersigned has agreed with you that it will not take any steps to enforce the Guarantee for a period of 91 days from the date hereof in consideration of which you will grant to us a subordinated mortgage to the extent of $1,000,000 on certain property owned by you ...
>
> You affirm and represent to us that the Guarantee is in our favor and is in full force and effect and that you have no defense, offset or counterclaim with respect thereto."

The mortgage is headed "Mortgage" in large bold letters and initialed on each page and signed by Susan Rosner. It places a $1 million dollar mortgage on Mrs. Rosner's Westbury residence. (PX KB 7).

Mrs. Rosner testified at the trial that McCormick told her that her husband needed "more money to keep the business going"; that he had "great expectations that Stanley is an excellent apparel man"; that she had "no need to concern [herself] [t]hat the other wives were going to sign the same type of paper." (Tr. 8/8/84 at 26). According to her, she specifically asked him if the other wives were going to sign and not only did McCormick reassure her but he also told her "that this paper would not be effective unless the other wives were going to sign it as well." (Tr. 8/8/84 at 26–27).

Stanley Rosner swore that he overheard McCormick telling her that he had discussed the mortgage with her husband "and we needed this for the business. And he would be able to talk to his people at the bank. And to continue our relationship. And that it would not be acted upon." (Tr. 8/8/84 at 127, 128). And Stanley Rosner added that if this had not been said the mortgage would never have been signed. *Ibid.*

KB was successful in obtaining a mortgage from Spencer Kent's wife but not from Renee Axelrod.

McCormick was not called as a witness by either side. A KB employee certified that McCormick had said in September 1981 that he was negotiating for a mortgage on Susan Rosner's house because he was uncomfortable with the situation with Side-by-Side and was trying to remedy it. (Tr. 6/15/84 at 246–247).

It is a fair inference from all the evidence that, although McCormick may have continued to have confidence in Stanley Rosner's abilities, that Side-by-Side was defunct and KB was trying to cut its losses by obtaining additional collateral from both Kent and Rosner. No new money was advanced to either Side-by-Side or Stanley Rosner subsequent to the execution of the mortgage.

During both the months of August and September, 981 the outstanding balance on KB's loan to Side-by-Side was just below

$2.5 million. (PX 1A) In both these months the interest charged on Side-by-Side's loan exceeded 25% because of the use in the computations of an artificial 360-day year. (DX ESIC EE; Tr. 6/15/84 at 245).

At the present time, due to continuing interest charges, Side-by-Side owes KB over $3,200,000.

*The Validity of the Mortgage given KB*

The mortgage Susan Rosner gave KB had a quite different genesis from the security interest given ESIC in her property. The mortgage came at the end of the financing relationship between her husband's corporation, Side-by-Side, and KB. It was security for a guarantee she gave at the beginning of that relationship and reaffirmed at its end. She challenges its validity on several grounds. First, she claims that she was induced by fraud to sign her original guarantee, its reaffirmation and the mortgage. Second, she claims KB charged higher interest than 25% on the loan her mortgage secured, making the loan usurious and invalidating the mortgage. Her position is that the interest rate went over 25% because (1) interest was charged on interest; (2) regardless when checks were received they were deemed not to have cleared for five days; and (3) interest was computed on the basis of a 360-day year. Further, she contends that the participation agreement of Axelrod and her husband released her from her guarantee. ESIC joins her in urging KB's loan to be usurious and invalidated by the participation agreements.

Mrs. Rosner testified that in originally giving KB her personal guarantee she relied on McCormick's statement that Sandra Lee Kent and Renee Axelrod would be giving similar guarantees and had she now received those assurances she would not have signed her personal guarantee of Side-by-Side's loan.

When she signed the letter reaffirming her guarantee and gave the mortgage on her house, she claims she was similarly misled by McCormick; that McCormick told her that the mortgage would not become effective until the other wives signed similar documents; that she was unaware of the condition of Side-by-Side; and that McCormick told her that her husband needed the money to keep the business going. Stanley Rosner claims overhearing McCormick telling her that the mortgage was needed for the business, that it would permit the relationship with KB to continue, and that the mortgage would not be acted upon. He testified that if these statements have not been made, the mortgage would not have been signed.

No similar claims were made by Mrs. Rosner when she was deposed prior to the trial with respect to what had been said to her on both occasions. Regarding the meeting, when she signed the original guarantee, all she exchanged with McCormick, according to her deposition, were the normal civilities. Nor was anything of any significance said to her when she executed the reaffirmation of her guarantee and the mortgage, according to her pre-trial testimony.

All the trial testimony from Susan and Stanley Rosner with respect to what Mr. McCormick said at the two meetings preceding the signing of the various documents was very strenuously objected to by KB as barred by the parol evidence rule. This evidence was admitted by the Court provisionally with the assurance that it would be disregarded if KB were correct, which the Court now concludes that it was.

Judge Breitel, in his dissent in *Long Island Trust Co. v. International Institute for Packaging Education, Ltd.*, 38 N.Y.2d 493, 498, 381 N.Y.S.2d 445, 344 N.E.2d 377 (1976), speaking for himself and a minority of three, explicated clearly and succinctly the law in New York with reference to the applicability of the parol evidence rule (which is a rule of substance, not procedure) to guarantors who seek to avoid their written obligations by claiming fraud in the inducement:

> "The ultimate principle is a simple one, namely, that an integrated written obligation may not be avoided by the tender

of parol, usually oral, evidence which contradicts or varies the written obligation. The great and hoary exception is that a party is always free to establish by parol evidence that the written undertaking by which he is apparently bound, never came into existence because of an agreed precondition that it did not take effect unless and until the extraneous precondition has come to pass. The great and hoary exception has its own exception, namely, that it is inapplicable if the proffered parol evidence itself contradicts or varies the terms of the written undertaking sought to be avoided. In short, the precondition must be consistent with the written undertaking."

■ The test, therefore, which the Court must apply in determining whether the proffered evidence is available is: does it contradict or vary the terms of the written obligation. *Meadow Brook National Bank v. Bzura,* 20 A.D.2d 287, 246 N.Y. S.2d 787 (1st Dept. 1964); *Wurlitzer Co. v. Playtime Distributors, Inc.,* 58 A.D.2d 684, 395 N.Y.S.2d 267 (3d Dept. 1977).

In *Long Island Trust Co. v. International Institute for Packaging Education, Ltd., supra,* the majority was of the opinion that the parol evidence did not necessarily contradict the particular guarantee there involved because the guarantee lacked the words that the guarantor "unconditionally guarantee" the repayment of the loan. 38 N.Y.2d at 498, 381 N.Y.S.2d 445, 344 N.E.2d 377. Had that language been there, the majority said, there would have been no room for any exception to the parol evidence rule.

■ That language lacking in *Long Island Trust Co., supra,* is present in Susan Rosner's guarantee of November 27, 1979. The pertinent language reads "... each of the three guarantors unconditionally guarantees the payment to you of all indebtedness ..." Therefore, *Long Island Trust Co.* is square authority for excluding the admissibility of the McCormick statements prior to its execution about what the other wives were going to do.

■ Parenthetically, even if such evidence were admissible it would not establish fraud. A statement that other wives were going to sign similar documents was nothing more than a forecast as to an event to occur in the future, which will not support fraud unless evidence is produced that the speaker knew that the event would not take place. Any such knowledge is negated by the preparation of documents for the signature of the wives of Rosner's other partners. Accordingly, the attack on the first guarantee must fail as a matter of law and as a matter of fact.

■ Application of New York's test to the evidence respecting the letter affirming the guarantee and the accompanying mortgage yields similar results for similar reasons, although perhaps more equivocally.

The claim that the letter agreement and the mortgage were executed in reliance on a promise to continue funding Side-by-Side varies the explicit statement in the letter that the consideration was a 91-day delay in enforcement of Susan Rosner's earlier guarantee. Nor can the absolute terms of the mortgage and its imposition of immediate obligations on the mortgagor be reconciled with a commitment that the mortgage was not to become effective until other documents were executed by other persons.

In the last analysis, however, it makes little difference whether or not the parol evidence rule excludes Mrs. Rosner's trial testimony since the Court is not inclined to credit it, despite the absence of any contradictory evidence, except for her own pre-trial deposition. Her claim that she was unaware of her husband's financial difficulties strains credulity.

As Mrs. Rosner observed, Stanley Rosner was her "bread and butter." (Tr. 8/8/84 at 31). That means that she and her three children looked to him for all their necessities. No family is unaware of the difference in atmosphere when the source of all necessities is flush and when

he is encountering financial difficulties.[5] Furthermore, Mrs. Rosner had independent evidence that her husband was in serious trouble. Not only had she received a letter from KB's attorney threatening enforcement of her guarantee, she had received a similar letter from ESIC's lawyers in August 1981. She had to know that the storm clouds were gathering. Indeed, why else would her husband have asked her to place a third mortgage on their one solid asset, the Westbury property. The very request reflected desperation.

The underlying truth appears to be that Stanley Rosner, in the hope of being allowed to continue to draw on KB's financial resources, told his wife to execute the mortgage which McCormick requested, and that she did exactly as she was told, just as she first testified.

It seems not unlikely that McCormick promised Stanley Rosner more than he ultimately was able to deliver and that Rosner would have not asked his wife to execute the mortgage, had he not hoped, or expected, continuing financial support from KB, but Stanley Rosner did not execute the mortgage, his wife did and there is no evidence that she was misled. As for Stanley Rosner himself, he is too experienced a businessman not to have been able to recognize the significance of documents absolute on their face, regardless of what assurances McCormick might have given him.

From the evidence it was clear that no one coerced Mrs. Rosner to sign the September 7, 1981 letter and mortgage. According to her own version of the events, she signed the mortgage while in her own home as the result of a simple request from KB's representative. No request could have been less threatening.

As for her claim that the mortgage lacked consideration, it is undisputed that in exchange for the mortgage KB promised to forbear execution on her guarantee for 91 days. Mrs. Rosner now claims that "parting with a one million dollar mortgage at a time when Side-by-Side was hopelessly insolvent represents the type of unconscionable act where 'no man in his senses and not under delusion would make on the one hand, and no honest or fair man would accept on the other hand.' " (Rosner's Br., p. 45). Her position is that "the extra time" which she bought with the mortgage was without value and that this fact was known to KB.

As a matter of law, the delay constituted adequate consideration to support the mortgage and this Court is in no position to evaluate what value the "extra time" had, or was thought to have, in the over-heated financial world in which Stanley Rosner operated.

Relevant in this connection is that the house itself, it would appear, was already forfeited under her earlier guarantee to KB, except that KB would have had to share its value with Susan Rosner's other creditors. Therefore, in giving a third mortgage Susan Rosner lost very little. She merely gave KB a preferred position over other creditors, for which a 91-day delay seems a fair, and not unconscionable, exchange.

Little time need be spent on the attack on the mortgage and loan based on the participation in that loan by Axelrod and the debtor's husband. Under the terms of the guarantee given by Susan Rosner, the participation agreements did not affect her obligations to KB since the guarantee explicitly states that it cannot be impaired by any modification between Side-by-Side and KB. See *National Bank of North America v. Sobell*, 31 A.D.2d 750, 297 N.Y.S.2d 476 (2d Dept. 1969). On the facts of this case, and particularly in view of the size of Side-by-Side's debt to KB, the

---

5. In the brief filed on behalf of Mrs. Rosner, her attorneys describe her as a housewife, suggesting a homebound individual with little experience in the business world. That is not the impression she made on the Court. She seemed a very sophisticated and competent young woman, more than able to take care of herself. Nor has she always been a housewife. Although belittling her experience, she acknowledged having, at various times, sold real estate, cosmetics and jewelry.

junior participation agreements could not have worked any prejudice to Susan Rosner.

This leaves the issue of usury. KB's loan, unlike that made by ESIC, was not at its outset usurious. The debtor maintains, however, that it became so because of the five-day float, the compounding of interest and the use of a 360-day year. The Court does not agree that either the float or the compounding of interest made the loan usurious. However, the Court does agree that this was the effect of the use of a 360-day year.

*Baldwin Factors Corp. v. C.D.R. Enterprises, Ltd.*, 57 A.D.2d 773, 774, 394 N.Y. S.2d 213 (1st Dept.1977) establishes that a provision of a loan agreement "that New York City checks should be subject to collection and bank clearance of three days was a valid and reasonable provision and did not render the agreement usurious." That the time period here was five, rather than three, days does not seem a significant enough difference to affect the result.

More troublesome is the claim that because unpaid interest at the end of each month was added to the unpaid principal on which interest was charged the following month that the interest charged exceeded twenty-five percent.

Despite the fact that adding unpaid interest to principal monthly is consistent with prevailing commercial practice, there is relatively little guidance in the decided cases as to the application of the usury statutes to a revolving credit agreement, like the one present here.

 The public policy of New York prohibits contracts calling for the prospective payment of compound interest, or of interest on interest. *Newburger-Morris Co. v. Talcott*, 219 N.Y. 505, 114 N.E. 846 (1916) (Cardozo, J.); *Young v. Hill*, 67 N.Y. 162 (1876); *Stewart v. Petree*, 55 N.Y. 621 (1874); *Debentureholders Protective Committee of Continental Investment Corporation v. Continental Investment Corporation*, 679 F.2d 264, 271 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74

L.Ed.2d 155 (1982); *Madison Personal Loan, Inc. v. Parker*, 124 F.2d 143, 145 (2d Cir.1941); *Transbel Inv. Co. v. Roth*, 36 F.Supp. 396 (S.D.N.Y.1940); *In re Guccione*, 41 B.R. 289 (B.C.S.D.N.Y.1984); *Matter of Carla Leather, Inc.*, 44 B.R. 457 (S.D.N.Y.1984). However, an agreement to pay interest on past due simple interest is enforceable. *American Express Co. v. Brown*, 392 F.Supp. 235, 238 (S.D.N.Y. 1975); *Giventer v. Arnow*, 37 N.Y.2d 305, 308, 372 N.Y.S.2d 63, 333 N.E.2d 366 (1975). Moreover, the penalty for charging interest on interest is a "limited sanction"; only the compounding clause is invalidated, the lender may recover its principal plus simple interest. *Giventer v. Arnow, supra*, 37 N.Y.2d at 309, 372 N.Y.S.2d 63, 333 N.E.2d 366. Furthermore, when such interest has been voluntarily paid, it may be retained. *Young v. Hill, supra; Baker v. Equitable Life Assurance Society*, 288 N.Y. 87, 90, 41 N.E.2d 471 (1942).

 That a revolving credit agreement, like the one here involved, in which unpaid interest is added to principal each month, compounds interest was settled in *Newburger-Morris v. Talcott, supra*. Such interest, therefore, cannot be recovered.

What then is the effect under the usury laws of calculating interest on the basis of a figure swollen by interest carried over from the prior month? Bankruptcy Judge Howard C. Buschman, III, in a very thoughtful opinion, suggests that it is "at least presumable that New York courts would not exempt from scrutiny for usury violations, variable interest rate loan agreements which, although legal on their face, ultimately require interest in excess of 25% per annum." *Matter of Carla Leather, Inc.*, 44 B.R. *supra* at 469. However, he concludes that this result would not necessarily lead to invalidation of the entire transaction:

"New York law has traditionally differentiated transactions that subsequently become usurious from those initially calling for interest to be paid at an usurious rate. Payments in excess of the legal rate of interest pursuant to demands un-

der an agreement not usurious in its inception 'cannot vitiate the original transaction ... (citations omitted). Such excess payments must be applied in reduction of the principal and against the lawful interest.' *In re Spiro's Will*, 280 App.Div. 982 [116 N.Y.S.2d 391] (2d Dept.1952). *See also Matter of the Accounting of Consalus*, 95 N.Y. 340 (1884)."

*Matter of Carla Leather, Inc., supra* at 469.

*Giventer v. Arnow, supra*, relied on by both sides, appears to support Judge Buschman's surmise that only the excess interest charge would be void. That case involved a loan repayable at the end of the year which provided that interest was to be paid at the rate of 7.50% per annum, the maximum then allowable, but was to be compounded quarterly. Special Term found the note usurious and granted the borrowers' motion for summary judgment when suit was brought on the note. The Appellate Division reversed and granted the plaintiff's summary judgment on the face amount of the note, plus simple interest. The Court of Appeals, however, refused to apply the limited sanction appropriate to ordinary compounding of interest, and held the entire loan void, saying:

> "Although this note provided that interest should be compounded quarterly, there was no provision that the loan be repaid or that interest be paid in quarterly installments. According to the terms of the instrument, no payment was due until 'one year from date' of execution. This, in other words, was not a case where the parties simply agreed in advance to compound interest upon default, which, in furtherance of public policy, calls for a limited sanction invalidating the compounding clause. Since no quarterly payments were ever due, the agreement to compound the interest was simply a computation device for increasing interest due upon maturity. It was as the defendants state, 'merely a way of expressing an interest rate of 7.72%'. As indicated, this is a 'greater sum ... than is prescribed in section 5.501' and

the note must be considered void and uncollectable (General Obligations Law § 5–511, subd. 1)." *Id.* 37 N.Y.2d at 308–309, 372 N.Y.S.2d 63, 333 N.E.2d 366.

If compounding interest alone, where the interest rate was already at the ceiling imposed by the usury laws, brought the interest charges above that ceiling, there was no need by the Court of Appeals to base its decision on the ground that "the agreement to compound the interest was simply a computation device." That it did, strongly suggests that, where the compounding is not an empty calculation, the severe penalties for making a usurious agreement will not be applied, rather the lender will be limited to recovering its principal plus simple interest. *Young v. Hill*, 67 N.Y. 162 (1876). Since, in this case, that figure far exceeds the proceeds from the sale of Susan Rosner's house, no purpose would be served by its calculation.

However, unless the courts of New York reject precedents now a century old, the use by KB of a period of time shorter than a year in computing the interest due, renders KB's loan usurious and, therefore, subject to the severe penalty reserved for such loans which, as *Giventer v. Arnow, supra*, notes, is to render the note void and uncollectable. KB's interest necessarily exceeded 25% when it used a 360-day year because for many months the basic rate used by KB in calculating the interest due was the maximum allowed by New York law. But twenty-five percent is the maximum amount that can be charged for the extension of money for one year, or 365 days. If the year is shortened, if it is cut down by five days, then the interest charged necessarily exceeds twenty-five percent. The excess is small, but the law is absolute.

As the court pointed out in *New York Firemen Insurance Co. v. Ely & Parsons*, 2 Cow. 678, 704 (N.Y.Sup.Ct.1824):

> "The effect of this mode of calculation is, to give to the lender interest for 365 days, upon a forbearance for 360; and

where the interest is seven per cent the amount received, upon this principle of calculation will exceed the rate allowed by law. Whether that excess be great or small is unimportant; for the least excess is as much usury as the most enormous."

The same result was reached in the companion case of *Keep v. Wager*, 2 Cow. 712 (N.Y.Sup.Ct.1824), *aff'd*, 8 Cow. 398 (1824). In keeping with the rule announced in *Ely & Parsons*, the court held that the shorter calendar year created a usurious loan.

*See also Utica Ins. Co. v. Tilman*, 1 Wend 555 (N.Y.Sup.Ct.1828) [usury established *prima facie* by proof that interest was calculated upon the principle of 360 days being a year]; *Koven v. Kline*, 245 A.D. 307, 308, 280 N.Y.S. 814 (1st Dept. 1935) [loan usurious where principal of loan was to be repaid in 50 weekly installments and interest thereon was computed for 52 weeks].

KB urges that these cases are no longer good law because Section 108(5)(b) of the Banking Law explicitly recognizes that in computing interest a 30-day month may be employed. The underlying principle, however, is not affected by the Banking Laws which simply change the result with respect to what constitutes usury for a particular type of loan. The authorization to use a 30-day period contained in the Banking Law is explicitly restricted to that section. The very fact that it is placed in the section dealing with what constitutes usury represents recognition that the use of an artificial period, such as 30 days instead of the actual days of the month (or 360 instead of 365 days for a year), can result in an otherwise legal rate becoming usurious.

Nor is the loan to Side-by-Side sheltered from the Penal Law by GOL-5-501(6)(b) which exempts from all laws regulating the maximum rate of interest "any loan or forbearance in the amount of $250,000 or more. Loans or forbearances aggregating $250,000 or more, which are to be made or advanced to anyone borrowing in one or more installments, pursuant to a written agreement by one or more lender shall be deemed to be a single loan or forbearance for the total amount ..."

What prompted the law was a prime rate reaching an all-time peak and "the absence of any well-developed body of law as to what is or is not included in determining 'interest.'" The 1980 Annual Report of the Committee on Banks of the New York Assembly, p. 7 (1980).

But KB's loan to Side-by-Side was below $2.5 million during the month in which Susan Rosner signed the mortgage on her home; it was also below $2.5 million during several of the months, including August and September, in which the interest charged, because of the use of a 360-day year, exceeded 25%.

KB contends that it is not the size of the debt at any one time that determines the applicability of the exemption but the total advanced over the life of the loan and because its total advances to Side-by-Side exceeded $2½ million its loan is covered by the exclusion from the usury law. Rosner and ESIC both dispute such an interpretation of the statute. They argue that the aggregation of the amount at stake must take into consideration the repayments of the principal by the borrower as well as the loans by the lender.

Unfortunately the issue of the applicability of this exemption to KB's loan to Side-by-Side was raised only after the trial was completed. As a result, the Court has not had the benefit of counsels' views in terms of the facts of this particular case that it would have liked.

As support for its interpretation, KB points to the concern reflected in the legislative history that the exemption might cover "revolving credit (credit card) balances" which is likely to occur only if periodic balances or advances are aggregated. However, the legislative history also indicates that the language in the bill "was changed to ensure that lenders could not aggregate loans to be eligible for the exemption."

In construing a statute the function of the court is to determine the legisla-

tive intent which is to be derived from the language the Legislature employs. The statute speaks of "borrowing in one or more installments, pursuant to a written agreement", that is language appropriate to a loan extended in segments. The word "installment" does not accommodate a revolving credit agreement, such as here involved. Side-by-Side was not receiving advances in "installments"; it was receiving continuous credit, as needed and as requested.

Furthermore, the construction urged by KB, would produce results inimical to sound policy and, consequently, could not have been intended by the Legislature. That construction would take outside the usury laws relatively small debts if created during the course of an actively revolving credit account which, turning over many times per year, could each reach $2½ million, if only advances and no repayments were counted.

Accordingly, KB's interpretation of the statute must be rejected.

KB has also referred the Court to a recent decision by Judge Bruce McM. Wright holding that use of a 360-day year in computing interest is not illegal. *Marine Midland Bank, N.A. v. Greenstein, et al.,* N.Y.Sup.Ct., Index 10527–1982, Special Term, Part I, October 1, 1984. The issue is not whether the use of a 365-day year is proper; there is no question but that such a method of computing interest is not, *per se*, illegal; the issue here is whether or not this legal device brings the rate of interest over the usury ceiling of 25%. And there is no doubt that it did.

KB deliberately employed a 360-day year to maximize the interest it was charging, although its interest rate was already as high as the statute allows interest to go. The essential element of intent is, therefore, present here since nothing more is needed than an intent to take and receive a rate of interest in excess of that allowed by law. *Hammond v. Marrano,* 88 A.D.2d 758, 759, 451 N.Y.S.2d 484 (4th Dept.1982); *Matter of Dane,* 55 A.D.2d 224, 266, 390 N.Y.S.2d 249 (3d Dept.1976).

*See Reschke v. Eadi,* 84 A.D.2d 904, 447 N.Y.S.2d 59 (4th Dept. 1981).

The loan to Side-by-Side having been rendered usurious by KB's method of computing interest, the mortgage given to secure that loan is void. As the Court views the pleadings, this is the only issue now before this Court for decision. The Court has not been asked to decide the validity of the guarantee executed by Mrs. Rosner on November 27, 1979 nor the letter reaffirming that guarantee signed on September 7, 1981.

The appropriate time to pass on the validity of the debtor's guarantee will be when KB files its claim against Mrs. Rosner's estate. At the present time this Court is deciding no more than that in September 1981 when Mrs. Rosner gave a third mortgage on her house to secure the loan from KB to Side-by-Side, that loan was usurious because the rate of interest being charged for it by KB exceeded the 25% ceiling imposed under the Penal Law. Accordingly, KB is no more entitled than is ESIC to have the proceeds from the sale of Mrs. Rosner's house turned over to it pursuant to its mortgage. Those proceeds must remain in Mrs. Rosner's estate for distribution to her general creditors.

For the foregoing reasons, KB's request for relief from stay is also being denied.

The Court does not deem it appropriate in the context of this adversary proceeding, and without notice to all creditors as required by Bankruptcy Rule 2002(a), to convert this Chapter 11 proceeding to a Chapter 7 as requested by KB.

The foregoing constitutes the Court's findings of fact and conclusions of law.

SETTLE JUDGMENT.