**In re GENERAL AMERICAN COMMUNICATIONS CORPORATION, Debtor.**

**Bankruptcy No. 83 B 11495 PA.**

United States Bankruptcy Court,
S.D. New York.

July 30, 1986.

Law Offices of Stuart A. Jackson, Certilman, Haft, Lebow, Balin, Buckley & Kremer, New York City, for debtor; Stuart A. Jackson, Ronald L. Mayers and Martin F. Brecker, of counsel.

Robson, Miller & Osserman, Cooper, Cohen, Singer, Ecker & Shainswit, New York City, for claimants; Morton S. Robson, Kenneth N. Miller, and Davis J. Howard, of counsel.

## MEMORANDUM DECISION AND ORDER

PRUDENCE B. ABRAM, Bankruptcy Judge:

On October 14, 1983, General American Communications Corporation ("GACC" or "Debtor") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. GACC thereby invoked the automatic stay of Bankruptcy Code § 362 and frustrated the efforts of Robson & Miller (the "Robson Firm") and WLW Funding Corp. ("WLWFC") to enforce an order of attachment obtained as a provisional remedy in an on-going and highly contentious state court suit they had commenced in June

1983 against GACC and Stuart R. Ross ("Ross"). In addition, GACC sought and obtained from the bankruptcy court a stay of an examination of Ross scheduled[1] for three days after the Chapter 11 filing on the grounds that his services were essential to a successful reorganization of GACC and that it would be prejudicial to GACC's reorganization attempt for Ross to take time away from the operation of GACC to defend the state court action.

On November 4, 1983, proofs of claim were filed by the Robson Firm[2] and WLWFC.[3] The bankruptcy court became the site for the litigation when on December 15, 1983, GACC filed objections to both proofs of claim.[4] By notice of motion dated August 13, 1984, the Robson Firm and WLWFC (collectively the "Claimants") sought summary judgment in their favor on the enforceability of the loans.

For the reasons which follow, this court denies the Claimants' motion for summary judgment. In addition, and notwithstanding the Claimants' early success in the state court and the absence of a cross-motion for summary judgment, this court finds that the claims of the Robson Firm and WLWFC must be disallowed.

## THE FACTS

At the times relative to the material events, GACC was in the business of pro-

---

1. Ross' non-appearance would have resulted in the State Court striking the answers of Ross and GACC.

2. The Robson Firm's Claim, Claim No. 3, is in the amount of $2,866,489.92. This sum is comprised of $136,574.15 on the Initial Loan, see description, *infra*, $24,283.33 on the Supplemental Loan, see description, *infra;* $214,848.95 on the TexCat I Loan, see description, *infra;* $90,916.05 in attorney's fees; $1,000,000 in punitive damages resulting from GACC's "intentional misrepresentations and the Debtor's conversion of notes which were pledged as collateral" for the three loans; and $1,399,867.44 for treble damages under the Racketeering Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* on the grounds that GACC received income derived from a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1).

3. The proof of claim filed by WLWFC, designated as Claim No. 2, is in the amount of $1,612,022.30. This amount is comprised of $254,194.72 for the TexCat II Loan, see description *infra;* attorney's fees and disbursements of $51,816.43 in connection with the loan; $1,000,000 in punitive damages resulting from GACC's "intentional misrepresentations and the Debtor's conversion of notes which were pledged as collateral" for the loans; and $306,011.15 for treble damages under RICO on the grounds that GACC received income derived from a pattern of racketeering activity.

4. A proof of claim had also been filed by Robson, Miller & Osserman seeking pre-petition legal fees and disbursements in the amount of $13,156.61. However, the objection does not concern this claim.

moting "tax-advantaged investments" in the form of limited partnership interests in ventures involving the production of television programming intended for the children's market. For several years and at the time the transactions set forth below were entered into, the Robson Firm provided legal services to Ross, GACC and several other corporations and partnerships controlled by Ross. Morton S. Robson ("Robson"), a member of the Robson Firm, was also a partner with Wake L. Warthen ("Warthen") in Wake L. Warthen & Co. ("WLW"), an investment banking firm. Kenneth Miller ("Miller"), Robson's partner in the Robson Firm, although not a partner in WLW, had a 50% interest in Robson's interest in WLW. Warthen, who has no interest in the Robson Firm, is the sole stockholder of WLWFC.

Ross, as he had with other similar notes, sought financing using as collateral the promissory notes (the "Notes") given by the investor limited partners. When he was unable to obtain the desired financing Ross sought assistance from Robson and Warthen.[5] Warthen contacted several banks but was unable to obtain financing secured by the Notes for Ross due to the unwillingness on the part of those contacted to make loans to tax shelter syndicators secured by investors' notes.

The Robson Firm and Warthen both maintained accounts and had long-standing credit relationships with Chemical Bank ("Chemical"). They determined to finance the Notes for Ross and to borrow the necessary funds for that purpose from Chemical (the "Chemical Loans"). They had previously entered into several similar transactions with Ross. As a result of Chemical's willingness to lend funds to the Claimants, the Claimants entered into a series of four, virtually identical loan agreements (the "Loan Agreements") with GACC (the "GACC Loans").

The first three loans Chemical made to Robson & Miller were evidenced by unsecured notes personally guaranteed by Robson, Miller and Warthen. However, with respect to the last loan, the two pertinent Chemical notes (one for $100,000 and one for $120,000) were signed by WLWFC. The smaller note was guaranteed by Robson, the Robson Firm and Warthen; the large one, by Robson, Miller and Warthen. The Chemical Loans make no reference to GACC or Ross. Although the investor notes were delivered to Chemical by the Claimants, the notes evidencing the Chemical Loans make no reference to them. With regard to the first three transactions, the interest on the Chemical Loans was set at prime plus 2%, while on the fourth, the interest was set at prime plus 3%.

On or about May 6, 1982 the first Loan Agreement (the "Initial Loan") was entered into between GACC, as borrower, and the Robson Firm and Warthen, as, collectively, lenders. Pursuant to the terms of the Initial Loan, GACC borrowed the sum of $110,000. Of this amount GACC received $93,000; the sum of $12,000 was paid to Warthen "in order to discharge certain obligations of the Borrower to that entity"; and $5,000 was paid to the Robson Firm "in order to discharge a portion of the obligations of the Borrower to that entity." The funds were disbursed to GACC on or about May 18, 1982. The loan was due approximately one year later and on April 30, 1983 when GACC was required to repay the loan principal of $110,000 plus "the actual interest and other costs to the Lender of its Borrowing." The term "Borrowing" is nowhere defined in the Initial Loan. As used, and in light of the modifying "its", it is clear that the term refers to the

5. On or about June 17, 1981, Warthen and Equidyne Corporation ("Equidyne") had entered into a "Non-Circumvention Agreement." In the agreement, on behalf of itself, its affiliated companies, principals, assigns, agents, employees, representatives and consultants Equidyne agreed not to utilize any financial intermediary introduced by Warthen without his knowledge and agreed to pay Warthen fees in connection with all financial transactions accomplished by such financial intermediaries. A fee of 5% of the amount of the financing was payable on all transactions other than letters of credit and mortgages. Ross, a signatory to the agreement, was a principal of Equidyne.

loans the Claimants obtained from Chemical. As security for the Initial Loan, GACC pledged 18 investor notes due April 1, 1983, each in the amount of $10,000 (a total of $180,000).

Thereafter, and on or about May 10, 1982, another Loan Agreement (the "Supplemental Loan") was entered into again between GACC, as borrower, and the Robson Firm and Warthen, as, collectively, lenders, for the sum of $20,000. GACC received $18,000 of the principal amount of this loan, which was disbursed to it on or about May 21, 1982; the remaining $2,000 was paid to WLW "in order to discharge certain obligations of the Borrower to that entity." As security for the Supplemental Loan, GACC pledged one promissory note due April 1, 1983 in the amount of $10,000. The provisions for repayment of principal and interest on the Supplemental Loan are identical to those in the Initial Loan.

The third loan transaction, entitled "TexCat Loan Agreement" (the "TexCat I Loan"), was entered into again with GACC, as borrower, and the Robson Firm and Warthen, as, collectively, lenders, on or about June 2, 1982. The principal amount of the TexCat I Loan was $175,000. Of this sum, $17,500 was paid to WLW "in order to discharge certain obligations of the Borrower to that entity", and $157,500 was disbursed to GACC on or about June 9, 1982. As security for the TexCat I Loan, GACC pledged 22 promissory notes representing 26 units in the amount of $9,000 each (a total of $234,000) each due April 5, 1983. Repayment of principal and interest was due less than a year later and on April 30, 1983. The repayment terms of the TexCat I Loan are identical to those in the Initial Loan.

The final agreement at issue, the "1982 GAC Video Production Services—TexCat II Associates Loan Agreement" (the "TexCat II Loan"), was executed on or about October 21, 1982 this time between GACC, as borrower, and WLWFC, as lender. Of the $220,000 stated principal, $22,000 was paid to WLW "in order to discharge certain obligations of the Borrower to that entity," $100,000 was disbursed to GACC, and the balance of $98,000 was to be paid to the borrower upon full repayment of the "Equidyne Loan."[6] The funds, including the $98,000, were disbursed in three installments during October and November of 1982. The TexCat II Loan was secured by 13 promissory notes payable on June 1, 1983, representing 26 units in the amount of $11,250 each (a total of $292,500). Payment of principal, interest and other charges was due on June 1, 1983.

GACC has made no payments on any of the Loans. Each of these four loan agreements provided that the lender would collect the pledged notes at maturity and apply the proceeds in payment of the loan. Any surplus was to be paid to the borrower, GACC. Prior to any collection of the Notes by the lender, Ross requested that Robson allow him to collect the Notes directly because he and GACC were then engaged in litigation with the general partners of TexCat Associates and TexCat Associates II Partnerships, in which the notemakers were limited partners. Ross had expressed concern that GACC's litigation posture would be prejudiced if the Notes were collected by the Robson Firm. The Robson Firm agreed to allow Ross to collect the monies due on the Notes with the understanding that the proceeds would be immediately turned over to Chemical in order to satisfy the Claimants' obligations to Chemical.

In April of 1983, the Robson Firm received a quantity of checks from several of the makers of the Notes payable to the Robson Firm for a total amount of approximately $250,000, accompanied by letters requesting that the funds be held in escrow pending resolution of the disputes with GACC. Ross requested that the checks be returned to the notemakers because, in his view, retention of the funds in escrow

---

**6.** The Equidyne Loan refers to a March 26, 1982 loan agreement in which the Robson Firm lent money to Equidyne Properties, Inc. ("Properties") and certain other Properties-related companies. These entities were also controlled in whole or in part by Ross.

would be injurious to his bargaining position with the partnerships. Although the Robson Firm was apparently reluctant to return the checks, an oral agreement was reached whereby they would return the checks and GACC or Ross would provide additional collateral. After returning the checks, the Robson Firm sent a letter to Ross setting forth the terms of the agreement for additional collateral. However, Ross did not return an executed copy of the letter indicating the acceptance of its terms.

It later came to the Robson Firm's attention that, prior to April 1983, Ross had received approximately $100,000 in payment on various of the pledged Notes and that he had retained these funds. The Robson Firm further alleges that by early June of 1983, Ross had collected $350,000 on the Notes and used the monies.

By letter dated June 3, 1983, the Robson Firm wrote Ross to confirm an agreement that Ross on behalf of GACC would provide the Robson Firm with additional collateral for the four loans. Although the reference line of the letter refers to the dates of each agreement, the body of the letter simply refers to the "loan agreements" without distinction among them. The Robson Firm agreed to apply any sums received to the loan agreements and further agreed that any payment to it would be "on behalf of any claim of Wake L. Warthen and/or WLW Funding Corporation with respect to the aforesaid loan agreements." Ross personally guaranteed the obligations set forth in the June 3, 1983 letter.[7]

On or about June 8, 1983, the Robson Firm and Warthen commenced an action in the Supreme Court of the State of New York, County of New York (the "State Court Action") in which they sought judgment in their favor on the Initial Loan, the Supplemental Loan and the TexCat I Loan. In addition, they alleged that GACC and Ross had fraudulently and criminally converted the Note proceeds, that such acts constituted grand larceny and that as a result of the fraud and conversion the Robson Firm and Warthen were damaged in excess of $450,000 and entitled to punitive damages of $1,000,000. Subsequently the complaint in the State Court Action was amended to add a count seeking judgment on the TexCat II Loan and to add WLWFC as an additional plaintiff.

In the State Court Action, GACC and Ross raised, *inter alia*, the defense of criminal usury, alleging that the interest charged on each of the GACC Loans was in excess of 25% per annum.

On or about June 28, 1983, the State Court granted the motion of the Robson Firm and Warthen for an order of attachment.[8] An order of attachment in the amount of $365,000 was entered on or about July 7, 1983. Ross and GACC moved to vacate the attachment on the grounds that it had been obtained based on fraudulent representations and that disclosures during depositions of plaintiffs had indicated a lack of likelihood of success on the merits as well as the interposition of substantial counterclaims. The plaintiffs responded by requesting that the amount of the attachment be increased from $365,000

7. It does not appear, however, that Ross intended to guarantee the four loans themselves.

8. In granting the motion seeking an order of attachment the court reasoned that:
"[I]t would appear far more likely that the defendants [Ross and GACC] are and will remain in breach of their fiduciary duty to pay over the proceeds of the promissory notes to plaintiffs [the Robson Firm and Warthen] and continue to conceal their whereabouts, rather than that the defendants will succeed in establishing the sole substantial defense raised: that the underlieing [sic] transaction was usurious * * * Although the partnership plain-

tiff is designated here as 'lender' under a 'loan agreement,' it seems clear that its role was to act as a guarantor for the genuine lender * * and that the partnership merely acted as a conduit for dispersal of the loan proceeds and * * * the collector and remitter of the repayments. Under these circumstances, there is a serious doubt as to whether the defense of usury will have any application * * *, especially since the real interest rate was at all times set by the Bank, a rate over which plaintiffs had no control whatsoever * * *" Decision of State Court Justice Richard W. Wallach, June 28, 1983.

to $650,000. By decision dated September 1, 1983, the State Court denied the motions to vacate the attachment and granted the motion to increase the amount to $650,000.[9]

## DISCUSSION

### Summary Judgment

Summary judgment may be granted only when "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Federal Rules of Civil Procedure 56(c) and Bankruptcy Rules 7056 and 9014. *See also In the Matter of Iota Industries, Inc.,* 35 B.R. 693, 695 (Bankr.S.D.N.Y.1983); *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980); and *Grand Union Co. v. Cord Meyer Development Corp.,* 735 F.2d 714, 717 (2d Cir.1984). The party seeking the grant of summary judgment must demonstrate "the absence of any material factual issue genuinely in dispute." *In re Tampa Chain Company, Inc.,* 35 B.R. 568, 573 (Bankr.S.D.N.Y. 1983). *See also United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir.1982); *Quinn v. Syracuse Model Neighborhood Corp., supra.* The court "must resolve all doubts in favor of the party opposing the motion." *In the Matter of Iota Industries, Inc.,* 35 B.R. at 695. *See also Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). All inferences to be drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. den.* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754. The court's function with respect to the motion for summary judgment is not to try issues of fact but to determine "wheth-

er there are issues to be tried." *Schering Corp. v. Home Insurance Company,* 712 F.2d 4, 9 (2d Cir.1983) *quoting Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir.1975); *see Katz v. Goodyear Tire and Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984); *In the Matter of Iota Industries, Inc., supra.* In a summary judgment motion the "key is issue-finding, not issue-resolution." *United States v. One Tintoretto Painting,* 691 F.2d at 606.

The court must be particularly cautious in considering a motion for summary judgment when state of mind is an element of the cause of action. Although state of mind is generally an issue of fact, its mere existence does not preclude the grant of summary judgment. *In re Weiss-Wolf, Inc. (Weiss-Wolf, Inc. v. Israel Discount Bank, et al.,* 60 B.R. 969 (Bankr.S.D.N.Y. 1986). *See also Hahn v. Sargent,* wherein the court stated:

"State of mind is difficult to prove and great circumspection is required where summary judgment is sought on an issue involving state of mind. But that does not mean that a party against whom summary judgment is sought is entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim." 523 F.2d at 468.

*Accord Berard v. General Motors Corp.,* 493 F.Supp. 1035, 1041 (D.C.Mass.1980).

A fact is material for summary judgment purposes only if it "affects the outcome of

---

9. In ruling on the motions, Justice Wallach stated:

"At no time has defendant Ross ever denied that he has wrongfully converted these monies without the slightest justification. The usury defense interposed by him as an afterthought has been held by the court to be insufficient to defeat the provisional remedy. Defendants' attempts continually to rehash that defense are nothing more than vexatious. * * * The misrepresentation relied upon is the circumstance that with respect to the

fourth loan agreement the lender is designated as WLW Funding Corp. and not one of the parties plaintiff to the lawsuit. It is uncontradicted that this corporation is an *alter ego* of Wake L. Warthen who is a plaintiff in the case, and the court is advised that a motion is presently pending to add this corporation as a party plaintiff. * * * The new evidence consists of disclosures made by plaintiffs in the course of their depositions that they have engaged in a course of investment banking transactions in the past."

the litigation." *Hahn v. Sargent,* 523 F.2d at 464. A material issue will preclude the grant of summary judgment only if it is genuinely in dispute. In *Hahn v. Sargent,* the court stated that:

"To be considered 'genuine' for Rule 56 purposes a material issue must be established by 'sufficient evidence supporting the claimed factual dispute \* \* \* to require a jury or judge to resolve the parties differing versions at trial.'" *Hahn v. Sargent,* 523 F.2d at 464 (citation omitted).

Therefore, although entitled to all inferences in its favor, a party opposing a motion for summary judgment may not rely "on the gossamer threads of whimsey, speculation and conjecture." *Manganaro v. Delaval Separator Co.,* 309 F.2d 389, 393 (1st Cir.1962).

■ In addition, in appropriate circumstances, it is permissible to grant summary judgment in favor of the non-moving party. *See* Wright, Miller & Kane, 10A *Federal Practice and Procedure: Civil 2d* 2720; *Lowenschuss v. Kane,* 520 F.2d 255 (2d Cir.1975); and *Procter & Gamble Independent Union of Port Ivory, New York v. Procter & Gamble Manuf. Co.,* 312 F.2d 181 (2d Cir.1962), *cert. den.* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053. It has been stated that:

"The grant of judgment for the non-moving party is clearly proper if both sides agree that there is no material fact issues and join in the request that the case be decided, for the moving or non-moving side, on the basis of a motion for judgment made by only one of them." Wright, Miller & Kane, 10A *Federal Practice and Procedure: Civil 2d* § 2720 at p. 29 (citations omitted).

The view of the Second Circuit is that: "[W]here \* \* \* the evidence of the facts bearing on the issues arising out of the complaint is all before the court in affidavit form, it is most desirable that the court cut through mere outworn procedural niceties and make the same decision as would have been made had defendant made a cross-motion for summa-

ry judgment." *Local 33, International Hod Carriers Building and Common Laborers' Union of America v. Mason Tenders District Council of Greater New York,* 291 F.2d 496, 505 (2d Cir. 1961).

The Claimants argue that the defense of usury is unavailable to GACC and that summary judgment should be granted in the Claimant's favor because:

1. The transactions were not loans from the Claimants to GACC;

2. Chemical was the true lender;

3. The Warthen and WLW fees were not interest;

4. Even if the transactions were loans, the Claimants did not receive a usurious rate of interest;

5. As a matter of law, GACC cannot prove that the Claimants had the requisite knowledge; and

6. GACC is estopped from asserting the defense of usury.

GACC has opposed the Claimants' motion for summary judgment on the grounds that there are material issues of fact in dispute and has not cross-moved for summary judgment. However, all the material facts are before the court and this court cannot allow the mere litigiousness of a party to determine whether or not a trial should be conducted. For the reasons discussed below, this court finds no material factual issue in dispute and thus no trial is required in order for this court to resolve the matter.

*Usury*

■ Courts are generally reluctant to hold a loan to be usurious because it results in the forfeiture of both principal and interest. *See Freitas v. Geddes Savings and Loan Association,* 63 N.Y.2d 254, 481 N.Y.S.2d 665, 670–71, 471 N.E.2d 437, 441–43 (1984). Indeed, there is a "strong presumption under New York law against a finding of usury." *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 77 (2d Cir.1980), *cert. den.* 490 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109; *See also Cusick v. Ifshin,* 70 Misc.2d 564, 334 N.Y.S.2d 106 (1972), *af-*

*firmed* 73 Misc.2d 127, 341 N.Y.S.2d 280. A bare finding that the amount received exceeds the maximum legal rate is insufficient to establish usury. See *Freitas v. Geddes Savings and Loan Association, supra.* Proof of "usurious" intent is necessary to sustain a finding of usury. *In re Potter,* 367 F.2d 513, 515 (2d Cir.1966). A corporation is prohibited from interposing the defense of usury, G.O.L. § 5–521(1), unless the corporation interposes the defense of criminal usury. G.O.L. § 5–521(3); P.L. § 190.40.[10]

It is crucial to a finding of usury that there exist a "loan or forbearance".[11] G.O.L. § 5–501. *See also GTP Leisure Products, Inc. v. Cannella,* 58 A.D.2d 1040, 1041, 397 N.Y.S.2d 292, 293 (4th Dept.1977); *Zachary v. R.H. Macy & Co., Inc.,* 31 N.Y.2d 443, 457, 340 N.Y.S.2d 908, 918, 293 N.E.2d 80, 87 (1972). As was stated in an early New York case:

> "It is a fundamental doctrine governing the law of usury that the defense must be founded upon a loan or forebearance of money. If neither of these elements exists there can be no usury, however unconscionable the contract may be."
> *Orvis v. Curtiss,* 157 N.Y. 657, 661, 52 N.E. 690 (1899).

A classic definition of the term "loan" is as follows:

> "A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows."
> *In re Grand Union Co.,* 219 F 353, 356 (2d Cir.1915).

The term "loan" has also been defined as:

> "[A]n advancement of money * * * under a contract * * *, express or implied, whereby the person to whom the advance is made binds himself to repay it at some future time, together which such other sum as may be agreed upon for the use of the money * * *."
> 45 *Am.Jur.2d,* Interest and Usury § 117.

While recognizing the harshness to the lender in losing the entire principal when a loan is held to be usurious, the New York Court of Appeals has shown little sympathy for the lender's plight. *See, e.g., Szerdahelyi v. Harris,* 67 N.Y.2d 42, 499 N.Y. S.2d 650, 490 N.E.2d 517 (1986), modifying 488 N.Y.S.2d 164 (1st Dept.1985). *See also Kuklis v. Treister,* 83 A.D.2d 545, 441 N.Y. S.2d 465 (1st Dept.1981). The written agreement in *Szerdahelyi* portrayed a complete and straight-forward short-term secured loan which the lender contended was in substance another form of transaction, to wit, a purchase money mortgage, which would have precluded the usury defense.[12]

---

**10.** The New York Penal Law provides that:
"A person is guilty of criminal usury * * * when, not being authorized or permitted by law to do so, he knowingly charges, takes, or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." P.L. § 190.40.

**11.** It is undisputed that the transactions between GACC and the Claimants were not in the nature of a forebearance; Claimants have made no allegations of a "giving of additional time after the obligation [became] due and payable." *Thomas v. Knickerbocker Operating Co., Inc.,* 202 Misc. 286, 108 N.Y.S.2d 234, 235 (1951).

**12.** The Court of Appeals summarized the *Szerdahelyi* facts as follows:
"Plaintiff and Patrick Laurent were tenants in an apartment building that was converted to cooperative ownership. Plaintiff elected to purchase their apartment but she was unable to secure a conventional mortgage without Laurent, who was then out of the country. Accordingly, she consulted Martin Harris who was attorney for Laurent and his brother. Harris tried to secure a mortgage but when he was unable to do so, he approached some of his clients in an effort to arrange a short-term loan for plaintiff that could be superseded by a mortgage upon Laurent's return. Defendant Mensch * * * agreed to make the loan by liquidating all or part of her interest in a Dreyfus account that paid a return of approximately 18% per year, provided that the loan was fully secured and that the return was sufficient to compensate her for any loss arising from the liquidation of her account. Harris claimed that to insure this he contacted the Banking Department and was told that a return of 21% was permissible. In fact, the maximum allowable interest rate at that time * * * was 16%." 499 N.Y.S.2d at 651–2.

In *Szerdahelyi*, the Appellate Division had reversed the trial court's grant of summary judgment in favor of the plaintiff-borrower and remanded the case for trial. The Court of Appeals directed the entry of partial summary judgment in favor of the plaintiff-borrower and expressly rejected Appellate Division Justice Asch's concurring opinion, wherein he had argued that the loan should be recharacterized as a purchase money mortgage, thereby precluding the defense of usury. The Court of Appeals was of the view in *Szerdahelyi* that the purchase money mortgage defense had not even raised a material issue of disputed fact and found the grant of summary judgment in favor of the borrower was appropriate, even though the borrower had willingly paid interest on the loan for a year.

For the purpose of seeking summary judgment in their favor, the Claimants have conceded that the GACC Loans are, in fact, loans. That concession for the purposes of summary judgment cannot, of itself, warrant summary judgment for the adverse party. However, the court can determine the issue independently of the concession.

■ The Claimants' assertion that the transactions were not in fact loans is simply untenable and does not raise a triable issue of fact. A court cannot find a transaction non-usurious simply because the lender could have, but did not, cast the transaction in another form which would have eliminated the usury defense. As a matter of policy, parties will be strictly held to the terms of their contracts. See *Citibank, N.A. v. Plapinger, et al.*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). That a court will go beyond the form of a transaction and examine its substance if it appears that the form is a

subterfuge for what would otherwise be a usurious loan, *see Kuklis v. Triester*, 83 A.D.2d 545, 44 N.Y.S.2d 465 (1st Dept. 1981); and *In re Rosner (Kredietbank N.V. v. ESIC Capital Corp.)*, 48 B.R. 538, 547 *et seq* (Bankr.E.D.N.Y.1985), does not establish the converse, as *Szerdahelyi* illustrates.

■ Here, the Claimants chose the form of the transaction and drafted the agreements. Interestingly, although Robson is a practicing attorney, it was Warthen, who is not a lawyer, who prepared the loan agreements. Nor did Warthen simply use a pre-printed form from a legal stationery store. The agreement in each of the four transactions bears the title "Loan Agreement." The agreements each speak in terms of the Claimants collectively as the "Lenders," GACC as the "Borrower," "lending * * * the sum," the Notes "as security for the loan," and "repayment by the Borrower." In addition, the Loan Agreements contain default clauses and provide for an increase in the interest rate post-maturity. One of the conditions of default under the various agreements is "[a] default by the Borrower under any other loan agreement with the Lender." [13] The agreements each purport to contain the "entire understanding of the parties" which "may not be altered except in a written document executed by both the Lender and the Borrower." [14]

There is simply no basis upon which the court "could reasonably find that the transaction was other than what its form and documents indicate it to be." *Kuklis v. Treister*, 83 A.D.2d at 546, 44 N.Y.S.2d 465. *See also Ayers v. Pastime Amusement Company*, 283 F.Supp. 773 (D.C.S.C.1968), wherein the court stated

"A jury is permitted to draw only those inferences of which the evidence is reasonably susceptible, and may not be per-

---

**13.** This clause appears in ¶ 7(c) of each of the Loan Agreements with the exception of the Supplemental Loan which incorporates by reference the terms and conditions of the Initial Loan. In the ¶ 7(c) default clause of the TexCat II Loan, it would also be considered a default if Equidyne Properties, Inc. were to default "under any other loan agreement with the Lender."

**14.** This clause appears in ¶ 10 of each of the Loan Agreements, with the exception of the Supplemental Loan, which incorporates by reference the terms and conditions of the Initial Loan.

mitted to resort to speculation. A mere scintilla of evidence is not enough to create an issue. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere hope that something will turn up at the trial." 283 F.Supp. at 793.

The Claimants are of the view that the fact that the funds went from Chemical directly to a special account of the Robson Firm for GACC, and then to GACC, is evidence supporting a finding that the transactions were in substance loans between Chemical and GACC. The Claimants thus argue that they did not lend money to GACC, but rather that they merely provided assistance in obtaining financing from Chemical and "sold their credit" in the form of guaranteeing Chemical's loans to GACC. However, it is undisputed that there are no loan agreements between GACC and Chemical. Moreover, the Claimants concede that Chemical expressly declined to make loans to GACC. Therefore, the Claimants' argument is insufficient as a matter of law.

The Claimants assert that the retention of approximately 10% of each loan (the "Fee") was not an interest charge, but rather a fee for arranging the financing and for their guaranties to Chemical. The Loan Agreements themselves disingenuously state that the Fee was paid "in order to discharge certain obligations of the Borrower" to the entity receiving the Fee, although no prior debt existed. Robson states:

"9. In consideration for arranging the transaction, preparing the documents and providing the guarantees, [WLW] * * * would receive a fee equal to approximately 10% of the principal amount of the loan."

\* \* \* \* \* \*

"34. Additionally, it has always been Claimants' position that the amounts received by [WLW] * * *, equal to approximately 10% of the principal amount of each of these financing transactions, was a fee for arranging the financing and the

extension of credit and not interest as GACC claims." Affidavit of Morton S. Robson in Support of Motion for Summary Judgment Swon to August 8, 1984 (the "Robson Affidavit").

Robson added that he claimed an interest in these fees equal to one-half of the amounts received based upon his claim that he personally was a 50% partner in WLW.

Warthen states:

"The payments made by GACC to [WLW] * * * in connection with the loans at issue represented fees for arranging the financing transactions and for the extension of credit. This fact was made clear to Ross in my discussions with him. They were not interest charges, nor were they ever intended to be, as GACC claims, disguised interest charges * * *." Affidavit of Wake L. Warthen in Support of Motion for Summary Judgment Sworn to August 10, 1984.

This explanation is unconvincing. It is plain that Chemical made no loans to GACC and therefore the Claimants did not guarantee any obligation of GACC to Chemical. The Chemical Loans were made to the Claimants and provided the Claimants with the funds to make the loans to GACC.

"[T]he fact that a lender has to borrow from a third person the money loaned by him does not give the lender license to charge the borrower more than the highest lawful rate of interest for the loan of the money, and that if he does so, directly or indirectly, under whatever guise the charge in excess of lawful interest may be cloaked, the loan is usurious; and * * this is true even though the borrower may know that the money to be loaned him must be borrowed by the lender." 104 *A.L.R.* 245–6.

As a policy matter, to hold otherwise would render the usury statute unenforceable. A lender does not generally lend sums that are its own, but rather lends funds that it has in turn borrowed from others. For example, a bank obtains the funds it lends from its depositors and pays interest to its depositors, as well as from other borrow-

ings the bank makes, on which it must also pay interest. Whether a lender keeps an "inventory" of money on hand from which to make loans or borrows to fund a particular loan is a choice made by a lending institution depending on the needs of its business. The interest paid to obtain funds to lend is one of the basic overhead expenses a lender incurs in operating its business. It can no more be passed on to the borrower than can the cost of the office overhead. It is thus of no legal moment that the Claimants borrowed specifically to fund their loans to GACC.

■ Having determined that the Claimants' transactions with GACC were loans, a conclusion that the loans are unenforceable as usurious is inevitable because the Fee necessarily must be interest. Interest is the compensation fixed by the parties for the use of money. See *Black's Law Dictionary*, (Revised Fourth Edition). Although not denominated as interest, the Fees were plainly charges for the use of money and are by definition interest.

■ The Claimants contend, however, that the only interest charged was the interest charged by Chemical, an amount concededly not in excess of the criminal usury ceiling. However, that amount would not have afforded Claimants any profit on the transactions. Claimants concede that they intended to profit from the transaction in the form of the Fee. The Claimants also concede, as they must, that if the Fee, approximately 10% of the principal of each loan, is added to the interest admittedly charged, the rate exceeds 25%, the criminal usury ceiling.[15]

The Claimants rely heavily on the fact that the lender in each of the agreements was not the entity receiving the Fee. As to the Initial Loan, the argument is factually incorrect as Warthen was a lender as well as the fee recipient. In any event, it is not dispositive in the Claimants' favor that there were different entities. "[T]he actual lender cannot, in order to evade the usury statute, pretend to act as agent or broker, and exact a commission for his supposed service in procuring a loan from a third person." 32 *New York Jurisprudence*, Interest and Usury § 67 (citations omitted). Moreover, even in the case of a bona fide agent, "the exaction of a commission from the borrower by the lender's agent will render the transaction usurious if such exaction is known to, or authorized or ratified by, the lender." *Id.* at § 69 (citations omitted).

In the first three of the GACC Loans, the Robson Firm and Warthen were lenders. Robson was a partner with Warthen in WLW. Robson was also a partner in the Robson Firm with Miller. Miller was entitled to a 50% share in Robson's profits from WLW.[16] In the fourth loan, the TexCat II Loan, the lender was WLWFC, an

---

**15.** Robson calculates the interest rates on the four transactions would be 29%, 27.6%, 27% and 26.6%, respectively if the Fee is included. Robson Affidavit at ¶ 38 and Exhibits CC, DD, EE and FF thereto. Robson calculates that if only one-half of the Fee is included, i.e., that portion of the Fee to which Robson claims entitlement, the interest rates would be 22.8%, 22%, 21.5% and 21%, respectively. The Fee cannot be so divided. The Robson Firm's argument is simply specious reasoning. If the court were to accept this line of argument, partnership lenders could exact usurious interest rates with impunity by merely asserting that each partner was entitled to only a portion of the interest and thus no one received a usurious rate of interest.

GACC has calculated the interest rates to be in excess of 36% on the Initial and Supplemental Loans, 30.8% on the TexCat I Loan, and 33.38% on the TexCat II Loan. On the Initial Loan, one

source of the difference in calculation is that GACC has treated the $5,000 paid to the Robson Firm as interest. Robson asserts that the payment was in partial payment for unrelated legal services. A material issue of fact exists as to the purpose of this payment and the court therefore declines to treat it as interest for the purpose of granting summary judgment to GACC. GACC also used slightly higher figures for the interest charged on the Chemical Loans. In addition, GACC computes the rate based on a shorter period based on its assertions that the money was not advanced for a number of days after the date of the Loan Agreements. As the lower rates calculated by Robson exceed the criminal usury ceiling, this court need to resolve the issues raised by GACC's higher calculations.

**16.** The court takes no position regarding the rights of the co-lenders as between themselves.

entity of which Warthen is the sole shareholder. In the State Court Action, the court found that it was uncontradicted that this corporation was the *alter ego* of Warthen. See Footnote 9. In addition to these mutually intertwined relationships, the joint risk assumed by Robson, Warthen, the Robson Firm, WLW, WLWFC and Miller under the Chemical Loans clearly establishes the unity of interest between the lender and the Fee recipient.

Lenders may not disguise interest payments as "discounts" in order to exact usurious rates of interest from their borrowers. *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 446 N.Y.S.2d 917 at 925, 431 N.E.2d 278 at 287 (Ct.App.1981); *Band Realty Co. v. North Brewster*, 37 N.Y.2d 460, 373 N.Y.S.2d 97, 335 N.E.2d 316 (1975); *see also In re Rosner*, 48 B.R. at 548. In *Rosner* the court stated that:

"[P]ersons intending to enter into usurious transactions take pains to camouflage as payment for services or property, or anything other than what it really is, the interest they are exacting. * * * One well-recognized way of concealing an usurious transaction is 'an ostensibly unrelated contract providing for payment by the borrower for the lender's services which are of little value or which are not in fact to be rendered.' "

*In re Rosner*, 48 B.R. at 548 (citation omitted).

▇▇▇▇ While a lender is entitled to "pass-along" to its borrower the "reasonable, actual expenses" of a transaction, a lender may not disguise interest as expenses of the transaction, thereby causing the interest rate to exceed the legally permissible limit. *Gratton v. Dido Realty*, 89 Misc.2d 401, 404, 391 N.Y.S.2d 954 (S.Ct. Queens Cty 1977). As a general rule,

"A person may lend or sell his credit, and the fact that the amount to be paid therefor is more than the legal rate of interest * * * will not render the transaction usurious, so long as it is in good faith, and is not a cloak or artifice to conceal usury." 32 *New York Jurisprudence*, Interest and Usury § 48 (citations omitted).

However, "where the real truth is a loan of money, the wit of man cannot find a shift to take it out of the statute." 104 *A.L.R.* 245 (citing *Floyer v. Edwards* ).

The Claimants' final argument is that GACC cannot, as a matter of law, demonstrate that the Claimants had the required usurious intent, i.e., "knowingly" charged a rate in excess of the lawful limit. Of particular importance in the Claimants' view is that the Chemical Loans were floating rate loans. The Claimants disclaim specific knowledge of Chemical's prime rate at the time the GACC Loans were entered into. Ignorance is not, in this case, bliss. That the Claimants did not care what Chemical's rate was because they were passing it along to GACC cannot absolve them, particularly when they could readily have obtained the rate from Chemical. Moreover, the general area of the prime rate must be deemed to have been known by them. It strains credulity to suggest that Warthen, an investment banker, was unaware of the prime rate.

▇▇▇▇ Generally, whether a given fee or commission is a cover for usury is a question of fact. *London Realty Co. v. Riordan*, 207 N.Y. 264, 100 N.E. 800 (1913). *See also Cusick v. Ifshin, supra.* "Usury must be proved by clear evidence as to all its elements and will not be presumed." *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 594, 446 N.Y.S.2d 917, 431 N.E.2d 278 (1981) (citations omitted). Whether the Claimants intended to violate the law, *per se*, is irrelevant. Nothing more is needed than an intent to take and receive a rate of interest in excess of that allowed by law. *In re Rosner*, 48 B.R. 538, 547, 561 (Bankr.E.D.N.Y.1985). See also *American Timber and Trading Company v. First National Bank of Oregon*, 511 F.2d 980, 983 (9th Cir.1973), *cert. den.* 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 ("The act of charging the interest was intentional. This is sufficient to constitute a knowing violation of the law.") The Claimants intended to take and receive consideration, which this court has held to be

interest, in an amount in excess of that permitted by law. No more is required.

■ "In order for a transaction to be usurious it must be such at the inception." *Tchlenoff v. Dyner,* 178 Misc. 790, 36 N.Y. S.2d 514, 515 (1942). Therefore, in determining whether a variable interest rate loan is usurious, the crucial point in time at which the usurious intent should be assessed is at the very inception of the loan agreement. Thus, the mere fact that the Chemical Loans were at a variable rate of interest does not mandate a finding that the Claimants could not have known that the interest rate over the term of the GACC Loans could exceed 25% per annum. *See In re Carla Leather, Inc.,* 44 B.R. 457, 469 (Bankr.S.D.N.Y.1984), *affirmed* 50 B.R. 764 (S.D.N.Y.1985); *Kissel Company v. Gressley,* 591 F.2d 47 (9th Cir. 1979); *Kin-Ark Corporation v. Boyles,* 593 F.2d 361 (10th Cir.1979). *See also* Annot., "Usury in Connection with Loan Calling for Variable Interest Rate," 18 *A.L. R.4th* 1068. One can easily envision a scenario in which "sky-rocketing" interest rates cause a variable interest loan to exceed the criminal usury ceiling although the rate had been significantly below 25% per annum at the inception of the loan. However, that is not the scenario confronting this court. Here the rate of interest was in excess of the criminal usury ceiling at the inception of the loan and did not decrease sufficiently over the term of the loan to allow the overall interest rate to fall below the criminal usury ceiling. This court finds that such a loan must be considered usurious even though at the outset the possibility existed that a drop in the rate of its interest could have resulted in a total interest charge below the usury ceiling.

Nor were complex calculations required before it would be apparent that a real possibility existed that the loans would be useriors. The Chemical Loan interest that was charged to GACC under the terms of the GACC Loans was 18.5% per annum at the onset of the Initial Loan, Supplemental Loan, and TexCat I Loan, and 14.5% per annum at the onset of the TexCat II Loan. The Fee was set at approximately 10% in each of the four Loan Agreements. Simple addition indicates that at the onset of the loans, the rate of 28.5% per annum for the first three loans was well in excess of the criminal usury ceiling, without making any adjustment for the less than one year term of the loans. The rough rate calculation for the last loan of 24.5% per annum was so perilously close to the criminal usury ceiling that further calculations would be mandatory for any careful lender. Moreover, the Claimants failed to include a clause in any of the Loan Agreements to the effect that the rate of interest charged should not be construed to be in excess of the legally permissible limit.

The court is unpersuaded by the Claimants' argument that GACC is estopped from asserting the usury defense. The Claimants rely heavily on *Hammond v. Marrano,* 88 A.D. 758, 451 N.Y.S.2d 484 (4th Dept.1982), wherein the court stated:

"This is not the usual usurious transaction where an unscrupulous lender takes advantage of a necessitous borrower * * [Defendant] was active in borrowing and was familiar with the usury laws. He was a * * * friend of the plaintiff lender * * * [and] plaintiff was reluctant to loan the money and acquiesced only because of the * * * personal relationship between defendant and [plaintiff] * * * Although the Defendant was aware of the legal rate of interest at the time he drew the note and borrowed the money, he did not tell the plaintiff that the note was usurious * * * He had a duty to disclose that fact." 451 N.Y.S.2d at 486.

The Claimants argue that:

"As in *Hammond,* the transactions herein were not of the sort where an unscrupulous lender took advantage of a needy borrower. Stuart Ross, the Debtor's principal and an attorney, was active in borrowing and lending money and was familiar with all laws applicable thereto. In addition, he was a friend of Claimants' principals, and Claimants only acquiesced in facilitating the loans from Chemical

because of the relationship between them and Ross. If the Debtor's principal knew that the loans were usurious at their inception, he was obligated, under *Hammond, supra,* to disclose this fact to Claimants, an obligation which he failed to carry out. On the other hand, if Ross did not know that the transactions were usurious (as he has repeatedly admitted on the record), then usury must still fail as a defense because usurious intent on the part of the borrower (at inception) is just as crucial to proving usury as such an intent on the part of the lender. Either way, the Debtor is estopped from raising the defense of usury and its objections must therefore be denied." Claimants' Memorandum of Law in Support of Motion for Summary Judgment at 28.

The Claimants' estoppel argument does not raise a legally variable defense on the facts of this case. See *In re Rosner, supra,* 48 B.R. 549–50. See also *In re Seisay,* 61 B.R. 940, 14 B.C.D. 648, 650–1 (Bankr.S.D.N.Y.1986) (Court denied lender's motion for a new trial even though lender showed that borrower had been relieved of payment on a prior loan found to be usurious. "In other words, the plaintiff believes that the usury laws were intended to protect only innocent, unsophisticated individuals. This position is not supportable."). In *Hammond,* the court stressed the defendant-borrower's substantially superior knowledge regarding lending transactions as compared to the negligible experience of the plaintiff-lenders. Under those circumstances, the parties' close personal relationship gave rise to the "fiduciary" duty to disclose. Here it was the Robson Firm, as attorneys for GACC, which had a fiduciary relationship to GACC, rather than the other way around. Moreover, the Claimants controlled the form of the transactions.

 While this court is free to reject the preliminary findings in the State Court Action, it is appropriate briefly to discuss the reasons for doing so. The State Court granted the order of attachment pursuant to CPLR § 6201(3) which provides:

"An order of attachment may be granted ... where plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more of the defendants, when:

\* \* \* \* \* \*

"3. The defendant, with intent to defraud his creditors or frustrate the enforcement of *a judgment that might be rendered in plaintiff's favor,* has assigned, disposed of, encumbered or secreted property, or removed it from the state, or is about to do any of these acts". (Emphasis added).

Thus, in ruling on an application for an order of attachment, with respect to the plaintiff's ultimate right to recovery, a court need only find that the plaintiff "might" be entitled to judgment. Attachment is a provisional remedy that is discretionary with the trial court. *See Reading & Bates Corp. v. National Iranian Oil Co.,* 478 F.Supp. 724 (D.C.N.Y.1979). The crucial determination that needs be made revolves around the actual or potential fraudulent assignment, disposal or secretion of assets coupled with an intent to defraud by the party against whom the order of attachment is sought.

 Justice Wallach was presented with extremely persuasive evidence to the effect that Ross had converted the Notes, which Ross did not deny. Instead Ross asserted a defense of usury. On the basis of the state court's initial assessment that the usury defense would be unsuccessful and that the Claimants were likely to prevail, the State Court granted the motion seeking an order of attachment. This is not surprising in light of Ross' apparent, blatant conversion of the Notes. In addition, the Claimants were required to post a bond to secure the payment of damages to GACC and Ross in the event that the attachment order had been improvidently

granted.[17] The findings on which an attachment order is based do not preclude even the issuing court when the merits are considered at trial or on a motion for summary judgment. See *Credit Francais International, S.A. v. Sociedad Financiera de Comercio, C.A.*, 128 Misc.2d 564, 574–577, 490 N.Y.S.2d 670 (Sup.Ct.N.Y.Co. 1985).

Justice Wallach was of the view that pursuant to *Kuklis v. Treister, supra* and *Gratton v. Dido Realty, supra,* the court was required to look beyond to form of the transactions to their substance. This court's analysis leads it to a different conclusion. Justice Wallach relied on *DiSimon v. Ogden Associates*, 88 A.D.2d 472, 454 N.Y.S.2d 721 (2d Dept.1982) to support his preliminary finding that "[u]nder these circumstances, there is a serious doubt as to whether the defense of usury will have any application * * * " Again this court disagrees. This court does not find *DiSimon* controlling as it dealt with a purchase money loan and a clear tripartite agreement amongst a cooperative conversion sponsor, the cooperative corporation, and the tenants. The GACC Loans were not purchase money loans, nor was there any tripartite agreement, clear or otherwise, between and among GACC, the Claimants, and Chemical.

Finally, Justice Wallach was of the view that the element of "profiteering," "oft thought to be the essence of usury," was lacking. This court finds the State Court's reliance on *American Timber & Trading Co. v. First National Bank of Oregon*, 334 F.Supp. 888, *affirmed* 511 F.2d 980, *cert. den.* 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 to be misplaced. *American Timber & Trading* is a federal case dealing with the Oregon usury statute. Moreover, it holds

merely that the intent to do the "act," to charge the usurious interest, is required. It does not appear to require a profiteering motive or an actual intent to violate the usury statute *per se.*

With the resolution of the usury defense in favor of GACC, the balance of the Claimants' proofs of claim must fall. A finding of usury renders the loan agreements void *ab initio.* Thus a cause of action for conversion of the pledged collateral will not lie. The establishment of a cause of action in conversion requires the plaintiff to prove:

"(1) Legal ownership or an immediate superior right of possession, and

"(2) Exercise by defendant of an unauthorized dominion * * * to the exclusion of the plaintiff's rights."

*In re Weiss-Wolf, Inc., supra,* 60 B.R. at 982. *See also First National Bank of Highland v. Merchant's National Insurance Co.*, 89 Misc.2d 836, 392 N.Y.S.2d 836, 838 (1977), *affirmed* 65 A.D.2d 59, 410 N.Y.S.2d 679 (1978). The Claimants' "right of possession" to the Notes and the proceeds thereof is predicated upon their security interest under the terms of the loan agreements. A finding of usury operates to render these agreements unenforceable as to the collection of interest and principal and invalidates any security interest granted. Without a superior interest in the Notes, the Claimants have no cause of action for conversion. This court's conclusion should in no way be viewed as condoning Ross' deceptive conduct relative to the Notes.

The Claimants' RICO claims must also fall because they are predicated on the enforceability of the GACC Loans.[18]

17. The initial order of attachment directed that "[T]he Plaintiffs' undertaking be, and the same hereby is, fixed in the sum of $55,000.00 of which amount the sum of $36,500.00 thereof is conditioned that the Plaintiffs will pay to the Defendants all costs and damages, including reasonable attorneys fees, which may be sustained by reason of the attachment if the Defendants recover judgment or it is finally determined that the Plaintiffs were not enti-

tled to an attachment of the Defendants' property, and the balance thereof is conditioned that the Plaintiffs will pay to the Sheriff all of his allowable fees ..." Order of Justice Wallach, dated July 7, 1983.

18. Because it finds the usury defense to be dispositive, the court need not reach GACC's argument premised upon G.O.L. § 5–531, which limits the fee that may be charged for the brokerage, soliciting, or procuring of a loan or fore-

Claim No. 3 of the Robson Firm and Claim No. 2 of WLWFC are therefore disallowed and expunged.

It is so ordered.

bearance to ½ of 1% of the principal amount of the loan or forebearance.