## In re GENERAL AMERICAN COMMUNICATIONS CORPORATION, Debtor.

### Nos. 86 Civ. 7044 (WCC), 83 B 11495 (PBA).

United States District Court, S.D. New York.

May 21, 1987.

Law Offices of Stuart A. Jackson, New York City, for debtor; Stuart A. Jackson, of counsel.

Certilman, Haft, Lebow, Buckley & Kremer, New York City, and Cooper Cohen Singer Ecker & Shainswit, New York City, Morton S. Robson, Kenneth N. Miller, of counsel, for claimants Robson & Miller and WLW Funding Corp.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Claimants, Robson & Miller ("R & M") and WLW Funding Corporation ("WLWFC") have appealed a decision by Judge Prudence Abram, of the bankruptcy court in the Southern District of New York, which denied their motion for summary judgment and granted summary judgment to respondents, General American Communication Corporation ("GACC" or "respondent"), *sua sponte*.

For the reasons outlined below, the decision of the bankruptcy court is reversed and the case is remanded to that court for further proceedings.

## BACKGROUND

Stewart R. Ross ("Ross") is the president and has 100 percent control of GACC. During the time period relative to this action, GACC was in the business of promoting "tax-advantaged investments", for the production of children's television programming, to individual investors and limited partnerships. Each investor's payment to GACC was partially in cash and partially in the form of promissory notes ("Notes"). Beginning in 1980 and continuing for a period of approximately three years, including the time the transactions set forth below were entered into, R & M provided legal services to Ross and several other corporations and partnerships controlled by Ross, one of which was GACC. Morton S. Robson ("Robson"), a partner of R & M, was also a partner with Wake L. Warthen ("Warthen") in Wake L. Warthen & Co. ("WLW"), an investment banking firm. Kenneth Miller ("Miller"), Robson's partner in R & M, although not a direct partner in WLW, had a 50% share of Robson's interest in WLW. Warthen, who has no interest in R & M, is the sole stockholder of WLWFC.

Ross sought financing for GACC, using the Notes as collateral, but was unsuccessful. He then sought assistance from

WLW, who contacted several banks but was also unable to obtain financing. Banks were reportedly unwilling to lend money to tax shelter syndicators, using investors' Notes as collateral, due to the banks' potential liability to the individual investors.

The claimants, in a continuing effort to help Ross obtain the financing necessary to complete the production of GACC's programs, determined that by acting as a conduit they could avoid the banks' potential liability to the individual investors. This would make the Notes acceptable as collateral. The claimants approached Chemical Bank ("Chemical"), where they maintained accounts and had long-standing relationships, and explained that if Chemical would make loans to R & M, R & M could then lend those monies to GACC. GACC would simultaneously execute an agreement acknowledging its obligation to R & M. As security for the indirect loans to GACC, the Notes would be endorsed in favor of R & M which, in turn, would deliver them to Chemical. The Notes would be personally guaranteed by Warthen, Robson and, on certain occasions, by Miller. Payments received on the Notes were to be deposited in a Special Account for GACC ("GACC Special Account") and paid directly to Chemical; any surplus would be turned over to GACC. Chemical agreed to these terms and entered into four loan transactions with R & M. The interest rate charged by Chemical on the first three transactions was set at prime plus 2%, while on the fourth loan the interest was set at prime plus 3%. Upon receipt of the money from each loan, after deducting their 10% fee, R & M lent an equal amount to GACC under four separately documented loan agreements (the "Loan Agreements"). The interest charged to GACC was exactly the same as the interest charged by Chemical. The loans are structured identically for all relevant purposes.

No written agreement was entered into between the parties prior to claimant's procurement of a lender. According to the claimants, however, as consideration for finding a lender, arranging the transaction, preparing the documents and providing the guarantees, it was agreed that WLW would receive a fee of approximately 10% of the principal amount of each loan. Payment would be made by deducting the fee from the principal loaned to GACC. The written loan agreements do not explain the basis for this fee, and provide only that the 10% fee was "in order to discharge a portion of the obligations of the Borrower."

The first of the four loan transactions at issue entitled "Loan Agreement" (the "Initial Loan"), dated May 6, 1982, is in the amount of $110,000. The second agreement, entitled "Supplemental Loan Agreement" (the "Supplemental Loan") dated May 10, 1982, is in the amount of $20,000. The Supplemental Loan, while a separate transaction, refers to and adopts certain provisions of the Initial Loan agreement. The third loan entitled "TexCat Loan Agreement" (the "TexCat Loan") and dated June 2, 1982, is in the amount of $175,-000. The Initial Loan, Supplemental Loan and TexCat Loan form the basis of R & M's claim, and are between R & M and Warthen collectively as lenders, and GACC as borrower. The three corresponding loans Chemical made to R & M are personally guaranteed by Robson, Miller and Warthen. The claim of WLWFC is based upon a fourth loan agreement entitled "1982 GAC Video Production Series: TexCat Associates II Loan Agreement" (the "TexCat II Loan"), dated October 21, 1982, and is in the amount of $220,000. This final loan is between GACC as borrower, and WLWFC as lender. The corresponding loan between Chemical and WLWFC consisted of two notes, one for $100,000 and one for $120,000. The $100,000 note is guaranteed by Robson, R & M and Warthen; the $120,000 note, by Robson, Miller and Warthen. The claimants delivered the Notes to Chemical, although the notes evidencing the Chemical Loans make no reference to them.

Pursuant to the terms of the loan agreements, GACC was obligated to inform its investors that the Notes had been assigned as collateral for financing by GACC and direct the investors to make their payments directly to the GACC Special Account.

GACC never sent such notices to its investors and, when Warthen was arranging to have such notices mailed in early 1983, Ross requested that he be allowed to collect on the Notes directly. At the time, Ross and GACC were involved in disputes with the general partners of the TexCat Associates and TexCat Associate II Partnerships (in which the makers of the Notes were limited partners). Ross expressed concern that GACC's litigation posture would be prejudiced if the proceeds of the Notes were collected by R & M. Therefore, R & M agreed to allow Ross to collect the monies due on the Notes with the understanding that the proceeds would be immediately turned over to Chemical in order to satisfy claimants' obligations to Chemical.

In April of 1983, R & M received from the investors checks for payments on the Notes, totaling $250,000, payable to R & M. These checks were accompanied by letters requesting that the funds be held in escrow pending resolution of the disputes with GACC. When Ross was advised of the receipt of these checks he requested that the checks be returned to their makers because, in his view, retention of the funds in escrow would be injurious to his bargaining position with the partnerships. Although R & M was reluctant to return the checks, an oral agreement was reached whereby GACC or Ross would provide additional collateral if the checks were returned. As agreed, R & M returned the checks to their makers and sent a letter to Ross setting forth the terms of the oral agreement for additional collateral. Ross, however, never returned an executed copy of the letter or additional collateral.

Throughout the first half of 1983 Ross maintained that he was unable to collect on the Notes. At a meeting on May 6, 1983, between Tim Noble, an officer of Chemical, Ross and Robson, Ross asserted that he was confident the Note payments would commence very shortly. It later came to R & M's attention that, prior to their return of the checks, Ross had received approximately $100,000 in payment on various Notes. In fact some payments on the Notes had been received as early as Febru-ary 1983. In early June of 1983, Ross admitted that he and GACC had collected in excess of $350,000 on the Notes, which they converted for their own use. R & M is liable to Chemical for the full amount of the Notes, totaling approximately $525,000.

On or about June 8, 1983, R & M and Warthen commenced an action in the Supreme Court of the State of New York, County of New York (the "State Court Action") in which they sought judgment in their favor on the Initial Loan, the Supplemental Loan and the TexCat Loan. They alleged that GACC and Ross had fraudulently and criminally converted the Note proceeds, that such acts constituted grand larceny and that as a result of the fraud and conversion R & M were damaged in excess of $450,000 and entitled to punitive damages of $1,000,000. Subsequently the complaint in the State Court Action was amended to add a count seeking judgment on the TexCat II Loan and to add WLWFC as an additional plaintiff.

GACC has made no payments on any of the loans and at no time has Ross denied that he wrongfully converted the Note proceeds. In the State Court Action, GACC's and Ross's sole argument was the affirmative defense of criminal usury, alleging that the interest charged on each of the GACC loans was in excess of 25% per annum.

On June 28, 1983, the State Court granted claimants' motion for an order of attachment in the amount of $365,000. Ross and GACC moved to vacate the attachment on the grounds that it was obtained based on fraudulent representations and that disclosures during depositions of plaintiffs indicated a lack of likelihood of success on the merits. The claimants responded by requesting that the amount of the attachment be increased from $365,000 to $650,-000. On September 1, 1983, the State Court granted the claimants' motion to increase the amount of attachment to $650,-000 and denied the respondent's motions to vacate the attachment.

On October 14, 1983, three days before Ross was to be examined, pursuant to an

order which provided for striking the answers of GACC and Ross upon his failure to appear, GACC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. The State Court Action was thereby automatically stayed as to GACC, frustrating claimants' efforts to enforce the order of attachment. In addition, GACC moved for a stay of Ross's examination, arguing that Ross's services were essential to a successful reorganization of GACC. The stay was granted by the bankruptcy court, on the ground that it would be prejudicial to GACC's attempted reorganization for Ross to take the time to defend the State Court Action.

Proofs of claim were filed by claimants on November 4, 1983. On December 15, 1983, the bankruptcy court became the site for the litigation, when GACC filed objections to both proofs of claim. By notice of motion dated August 13, 1984, claimants sought summary judgment in their favor on the enforceability of the loans. The bankruptcy court, 63 B.R. 534, denied the claimants' motion for summary judgment and granted summary judgment to Respondents, *sua sponte.*

## DISCUSSION

Courts are reluctant to hold a loan to be usurious because it results in the forfeiture of both principal and interest, *see Freitas v. Geddes Savings and Loan Association,* 63 N.Y.2d 254, 471 N.E.2d 437, 481 N.Y. S.2d 665, 670–71 (1984). Indeed there is a "strong presumption against a finding of usurious intent," *Lehman v. Roseanne Investors Corp.,* 106 A.D.2d 617, 483 N.Y. S.2d 106, 108 (2 Dept.1984), and "against a finding of usury," *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 77 (2nd Cir.1980), *cert. den.,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109. Therefore, "[u]sury must be proved by clear evidence as to all its elements and will not be presumed." *Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 594, 431 N.E.2d 278, 446 N.Y. S.2d 917 (1981); *Berg v. Cacoulidis,* 114 A.D.2d 986, 495 N.Y.S.2d 426, 427 (2nd Dept.1985).

■ While some courts require specific intent for a finding of usury, *In re Potter,* 367 F.2d 513, 515 (2d. Cir.1966), others require only a general intent, *Babcock v. Berlin,* 123 Misc.2d 1030, 475 N.Y.S.2d 212 (1984). For a loan to be criminally usurious under P.L. § 190.40 the alleged usurer must "knowingly [charge] a rate of interest in excess of 25% per annum", id.; *see also Mallis,* 615 F.2d at 77; *Salvin v. Myles Realty Co.,* 227 N.Y. 51, 124 N.E. 94 (1919). The determinative issue is whether there was an intent to charge and receive a rate of interest in excess of 25%, *In re Rosner,* 48 B.R. 538, 547, 561, (E.D.N.Y.Bankr. 1985); *Hammond v. Marrano,* 88 A.D.2d 758, 759, 451 N.Y.S.2d 484; *Matter of Dane,* 55 A.D.2d 224, 266, 390 N.Y.S.2d 249 (3d Dept.1976). Claimants in this case maintain that the 10% deduction from each loan was intended not as additional interest but as a finder's fee. Excluding this fee, the interest charged was well below the maximum rate allowed by law. Accordingly, there is an issue of fact as to whether claimants possessed the requisite intent required by P.L. § 190.40.

It is well settled that summary judgment may be granted only where "there is no genuine issue as to any material fact". Fed.R.Civ.P. 56(c); *Knight v. U.S. Fire Insurance Company,* 804 F.2d 9, 11 (2d Cir. 1986), *appeal pending.* Intent is a question of fact, *Estate of Levine v. Srebnick,* 97 A.D.2d 545, 468 N.Y.S.2d 50, 51 (1983); *Hammelburger,* 54 N.Y.2d at 594, 446 N.Y. S.2d 917, 431 N.E.2d 278; *Westhemeco Ltd. v. New Hampshire Ins. Co.,* 484 F.Supp. 1158 (S.D.N.Y.1980), *see SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). Similarly, whether a given fee or commission is a cover for usury is a question of fact, (see General Obligations Law, §§ 5–501, 5–521; P.L. § 190.40); *Hammelburger,* 54 N.Y.2d at 594, 446 N.Y. S.2d 917, 431 N.E.2d 278; *London Realty Co. v. Riordan,* 207 N.Y. 264, 100 N.E. 800 (1913).

It is well settled that "[s]upporting and opposing affidavits [in a motion for summary judgment] shall be made on personal knowledge," § 56(e) Fed.R.Civ.P. In the case at bar respondent's only affiant, Ron-

ald L. Meyers ("Meyers"), was not present during the formation of the Loan Agreements, and respondent has offered no evidence to show Meyers has personal knowledge of the relevant facts. It also seems pertinent that Ross, who has personal knowledge of all the material facts and is the president of GACC, has not submitted an affidavit.

Alternatively, claimants have submitted four affidavits, based on personal knowledge, supporting their claim. In Robson's affidavit of August 8, 1984, he alleged that the fee owed to WLW was not interest as GACC claims, but consideration for procuring a lender, arranging the transaction, preparing the documents and providing guarantees. Robson states that neither he nor Warthen ever attempted to determine what the effective interest rate would be if the 10% fee was treated as interest, since they never considered that payment to be an interest payment. In Warthen's affidavit of August 10, 1987, he testified that he reviewed Robson's affidavit and concurred with its statements as truthful and accurate. Clearly these affidavits raise factual questions regarding the issue of intent.

■ Respondent's supplemental brief claims that "[t]he loan of money was the only service performed by claimants." However, within the same paragraph, respondent states that "[p]rior to consummating the Loans, the claimants had ... attempted to arrange alternative methods of financing" for GACC. Respondent argues that the claimants' efforts to obtain financing prior to documenting their agreement, and the parties intent, should not be allowed as evidence because the Loan Agreements are fully integrated documents. However, "parties have a right to present extrinsic evidence of their intent" to remove and explain any ambiguity in the contract, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), *Cibro Petroleum Products v. Sohio Alaska Petroleum*, 602 F.Supp 1520, 1546 (N.D.N.Y.1985), *cert. den.*, — U.S. —, 107 S.Ct. 562, 93 L.Ed.2d 568, aff'd, 798 F.2d 1421, provided that the use of the extrinsic evidence would not be admissible to alter or vary the terms

of the agreement. *Cibro Petroleum Products*, 602 F.Supp at 1546. The extrinsic evidence which would be presented would not alter or vary the basis for claimants' 10% fee because the agreement is so vague that it is meaningless. The written Loan Agreements provide only that the fee was "in order to discharge a portion of the obligations of the Borrower." In order to affirm the granting of summary judgment, it would be necessary for the court to find that in the case at bar the borrowers were charged a fee without justification. Yet, on the facts presented, it is not possible to make such a finding. In the case at bar, the claimants agreed to involve themselves as intermediaries only after they were unsuccessful in their efforts as finders, due to the unacceptable nature of GACC's collateral.

■ Affirmance of the summary judgment would work a highly inequitable result: Ross would keep the money he misappropriated; claimants would not only be liable to Chemical for the full amount of all the notes, but would be forced to give up their fee, in addition to being criminally liable for usury. This result is certainly not justified on the present record. Although the claimants are designated as "lender" under "loan agreements," it appears more plausible that their role was to act merely as a guarantor to the genuine lender (i.e. Chemical Bank), and that the partnership merely acted as a conduit for transmittal of the loan proceeds to GACC and the collector and remitter of the repayments by the investors. Summary judgment is not appropriate where, as here, the intent of a party is at issue, *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 484 F.Supp. 1158, *SEC v. Research Automation Corp.*, 585 F.2d at 33.

## CONCLUSION

For the reasons outlined above, the decision of the Bankruptcy Court is reversed.

SO ORDERED.